Shartisha Williams

Shartisha Williams

Shartisha Williams

131-52 233 Street

Rosedale NY. 11422

(347) 421-8161

Shartisha@gmail.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Shartisha Williams
_____

_____
Write the full name of each plaintiff.

_____CV_____
(Include case number if one has been
assigned)

-against-

Do you want a jury trial?

New York City Health & Hospitals Corporation

☐ Yes    ☐ No

Dr. Ashwin Vasan

Dr. Mitchell Katz
_____
Write the full name of each defendant. The names listed
above must be identical to those contained in Section I.

## EMPLOYMENT DISCRIMINATION COMPLAINT

### NOTICE

The public can access electronic court files. For privacy and security reasons, papers filed with the court should therefore *not* contain: an individual's full social security number or full birth date; the full name of a person known to be a minor; or a complete financial account number. A filing may include *only*: the last four digits of a social security number; the year of an individual's birth; a minor's initials; and the last four digits of a financial account number. See Federal Rule of Civil Procedure 5.2.

## I.   PARTIES

### A.  Plaintiff Information

Provide the following information for each plaintiff named in the complaint. Attach additional pages if needed.

| Shartisha | N | Williams |
|---|---|---|
| First Name | Middle Initial | Last Name |

131-52   233  Street
Street Address

| Rosedale | NY | 11422 |
|---|---|---|
| County, City | State | Zip Code |

| (347) 421-8161 | Shartisha @ gmail.com |
|---|---|
| Telephone Number | Email Address (if available) |

### B.  Defendant Information

To the best of your ability, provide addresses where each defendant may be served. If the correct information is not provided, it could delay or prevent service of the complaint on the defendant. Make sure that the defendants listed below are the same as those listed in the caption. (Proper defendants under employment discrimination statutes are usually employers, labor organizations, or employment agencies.) Attach additional pages if needed.

Defendant 1:   Dr. Ashwin Vasan
Name

50  Water  Street              17th  Floor
Address where defendant may be served

| New York | NY | 10004 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 2:   Dr. Mitchell Katz
Name

125  Worth  Street
Address where defendant may be served

| New York | N.Y. | 10013 |
|---|---|---|
| County, City | State | Zip Code |

Defendant 3:

New York City Health and Hospitals
Name

50  Water  Street                          17th floor
Address where defendant may be served

New York                    NY              10004
County, City                State           Zip Code

## II.   PLACE OF EMPLOYMENT

The address at which I was employed or sought employment by the defendant(s) is:

New York City Health & Hospital
Name

460 Brielle Ave
Address

Staten Island                NY             10305
County, City                State           Zip Code

## III.   CAUSE OF ACTION

### A. Federal Claims

This employment discrimination lawsuit is brought under (check only the options below
that apply in your case):

☐ **Title VII of the Civil Rights Act of 1964**, 42 U.S.C. §§ 2000e to 2000e-17, for
employment discrimination on the basis of race, color, religion, sex, or national
origin

The defendant discriminated against me because of my (check only those that
apply and explain):

☐ race: _____

☐ color: _____

☑ religion: _____

☐ sex: _____

☐ national origin: _____

Page 3

☐ **42 U.S.C. § 1981**, for intentional employment discrimination on the basis of race

My race is: _____

☐ **Age Discrimination in Employment Act of 1967**, 29 U.S.C. §§ 621 to 634, for employment discrimination on the basis of age (40 or older)

I was born in the year: _____

☐ **Rehabilitation Act of 1973**, 29 U.S.C. §§ 701 to 796, for employment discrimination on the basis of a disability by an employer that constitutes a program or activity receiving federal financial assistance

My disability or perceived disability is: _____

☑ **Americans with Disabilities Act of 1990**, 42 U.S.C. §§ 12101 to 12213, for employment discrimination on the basis of a disability

My disability or perceived disability is: _____

☐ **Family and Medical Leave Act of 1993**, 29 U.S.C. §§ 2601 to 2654, for employment discrimination on the basis of leave for qualified medical or family reasons

## B. Other Claims

In addition to my federal claims listed above, I assert claims under:

☑ **New York State Human Rights Law**, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of age, race, creed, color, national origin, sexual orientation, military status, sex, disability, predisposing genetic characteristics, marital status

☑ **New York City Human Rights Law**, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, sexual orientation, alienage, citizenship status

☐ Other (may include other relevant federal, state, city, or county law):

_____

## IV.   STATEMENT OF CLAIM

### A.  Adverse Employment Action

The defendant or defendants in this case took the following adverse employment
actions against me (check only those that apply):

- ☐  did not hire me
- ☑  terminated my employment
- ☐  did not promote me
- ☑  did not accommodate my disability
- ☐  provided me with terms and conditions of employment different from those of
similar employees
- ☐  retaliated against me
- ☑  harassed me or created a hostile work environment
- ☐  other (specify): _____

_____

### B.  Facts

State here the facts that support your claim. Attach additional pages if needed. You should
explain what actions defendants took (or failed to take) *because of* your protected
characteristic, such as your race, disability, age, or religion. Include times and locations, if
possible. State whether defendants are continuing to commit these acts against you.

Please  see  attached.

As additional support for your claim, you may attach any charge of discrimination that you filed
with the U.S. Equal Employment Opportunity Commission, the New York State Division of
Human Rights, the New York City Commission on Human Rights, or any other government
agency.

IV. STATEMENT OF CLAIM

B. FACTS

I have been employed with NYCHHC as a hospital care investigator since September 2017. And, I have been successfully working from home since March 2020. On or about 9/8/21, I was notified by a three way call from my manager and director followed by an email that I had to get a COVID inoculation by 9/27/21 unless send in documentation for an exemption by 9/10/21. I sent in my religious exemption as required by the company. 9/24/21 I received an email that my religious exemption was accepted and approved, however from 9/27/21 – 11/26/21 I was still placed on unpaid leave stating the presence of unvaccinated staff would pose an undue burden on the system. Monday 10/4/21, I requested that the company review and reconsider the decision placing me on unpaid leave as the same accommodations were available that had been available and performed since I was already successfully working from home for the last 18 months. On 10/22/21, I received an email which stated the option to voluntarily resign. On 10/27/21, I sent an email requesting an accommodation to continue to tele-work as required by NYC human rights law. My department has been tele-working since the beginning of this unforeseen medical quandary and continue to do so, as to which, and I should too be afforded the same accommodation. On 10/29/21 I received an email highlighting that my religious exemption was approved. Then on 11/16/21 I received an email with Option 1: Get Vaccinated, and I will be able to return to work. Option 2: Voluntarily Resign and get benefits till the end of the year with one week pay. Option3. Administrative Separation as of Monday November 29, 2021. On 11/22/21 I received an email of a reminder of my options. On 11/24/21 I submitted a medical letter from my healthcare provider Dr. Mittmen. He found that I am allergic to some of the ingredients contained in the inoculation . The

inoculation will negatively affect my body's chemistry. I again asked for a reconsideration and allow me to continue to work with my medical documentation and religious exemption. I was terminated from NYCHHC effective 11/27/22.

## V.    ADMINISTRATIVE PROCEDURES

For most claims under the federal employment discrimination statutes, before filing a lawsuit, you must first file a charge with the U.S. Equal Employment Opportunity Commission (EEOC) and receive a Notice of Right to Sue.

Did you file a charge of discrimination against the defendant(s) with the EEOC or any other government agency?

☒   Yes (Please attach a copy of the charge to this complaint.)

     When did you file your charge?        5/4/22

□   No

Have you received a Notice of Right to Sue from the EEOC?

□   Yes (Please attach a copy of the Notice of Right to Sue.)

     What is the date on the Notice?

     When did you receive the Notice?

□   No

## VI.   RELIEF

The relief I want the court to order is (check only those that apply):

□   direct the defendant to hire me

□   direct the defendant to re-employ me

□   direct the defendant to promote me

□   direct the defendant to reasonably accommodate my religion

□   direct the defendant to reasonably accommodate my disability

☒   direct the defendant to (specify) (if you believe you are entitled to money damages, explain that here)

Please see attached

Page 6

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | EEOC<br>FEPA | 520-2022-05127 |

| **New York State Division Of Human Rights** | and EEOC |
|---|---|
| *State or local Agency, if any* | |

| Name *(indicate Mr., Ms., Mrs.)* | Home Phone | Year of Birth |
|---|---|---|
| Shartisha Williams | 347-421-8161 | |

| Street Address |
|---|
| 131-52 233Street |
| ROSEDALE, NY 11422 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. *(If more than two, list under PARTICULARS below.)*

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| NYCHHC | 501+ Employees | |

| Street Address |
|---|
| 460 1brielle ave |
| STATEN ISLAND, NY 10314 |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON | DATE(S) DISCRIMINATION TOOK PLACE | |
|---|---|---|
| | Earliest | Latest |
| Religion, Retaliation | 09/08/2021 | 11/29/2021 |

THE PARTICULARS ARE *(If additional paper is needed, attach extra sheet(s)):*

I began my employment on September 17, 2017. My position was Hospital Care Investigator. On September 8, 2021, I was notified by my employer that it would be requiring all employees to be fully vaccinated by September 27,2021. I sincerely hold a religious belief that conflicts with my employers vaccination requirement. During my employment, I notified my employer of my religious belief and requested a religious accommodation to Respondents Covid-19 vaccination mandate, which my employer approved on September 24, 2021. But on September 27, 2021, I was placed on leave without pay from my employer because I did not comply with the COVID-19 vaccine mandate. On November 29, 2021, I was terminated for not complying with the COVID-19 vaccine mandate. I believe I have been discriminated against because of my religion, Christian/Jewish, in violation of Title VII of the Civil Rights Act of 1964, as amended.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.<br>SIGNATURE OF COMPLAINANT |
| **Digitally Signed By: Shartisha Williams** | |
| 08/02/2022 | SUBSCRIBED   AND   SWORN   TO   BEFORE   ME   THIS   DATE<br>*(month, day, year)* |
| *Charging Party Signature* | |

CP Enclosure with EEOC Form 5 (11/09)

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

1. **FORM NUMBER/TITLE/DATE.** EEOC Form 5, Charge of Discrimination (11/09).

2. **AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117, 42 U.S.C. 2000ff-6.

3. **PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

4. **ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

5. **WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging and responding parties and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, the ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

## NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

## NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

## VI. RELIEF

I am asking for money damages.  NYCHHC asked for submitted documentation to continue employment. I submitted my religious exemption which was approved but I was placed on unpaid leave. I also submitted medical documentation which stated that I was allergic to some of the ingredients contained in the vaccine and I was terminated.  However HHC, was inconsistent with what was asked by not following their own guidelines.  I did as required and as a result was terminated after continuously asking for accommodation to continue working from home and reconsideration of denying me to work being that my department was and still is working from home.  I was discriminated against and harassed by the many emails to get vaccinated, resign or be terminated. Ignoring my request to continue working and letting them know I did not plan on resigning.  I have suffered an emotional and  financial hardship for myself as well as my family. I have out of pocket medical expenses due to the abrupt drop of insurance, had to cut back on educational gains for my child and other after school activities, my financial obligations are strained.

## VII.   PLAINTIFF'S CERTIFICATION

By signing below, I certify to the best of my knowledge, information, and belief that:
(1) the complaint is not being presented for an improper purpose (such as to harass,
cause unnecessary delay, or needlessly increase the cost of litigation); (2) the claims are
supported by existing law or by a nonfrivolous argument to change existing law; (3) the
factual contentions have evidentiary support or, if specifically so identified, will likely
have evidentiary support after a reasonable opportunity for further investigation or
discovery; and (4) the complaint otherwise complies with the requirements of Federal
Rule of Civil Procedure 11.

I agree to notify the Clerk's Office in writing of any changes to my mailing address. I
understand that my failure to keep a current address on file with the Clerk's Office may
result in the dismissal of my case.

Each Plaintiff must sign and date the complaint. Attach additional pages if necessary. If seeking to
proceed without prepayment of fees, each plaintiff must also submit an IFP application.

| | | |
|---|---|---|
| 10 / 5/ 22 | | _Shatsl Willia_ |
| Dated | | Plaintiff's Signature |
| Shartisha | | Williams |
| First Name | Middle Initial | Last Name |
| 131-52   233 | Street | |
| Street Address | | |
| Rosedale | N Y | 11422 |
| County, City | State | Zip Code |
| 347-421-8161 | | Shartisha @ gmail.com |
| Telephone Number | | Email Address (if available) |

I have read the attached Pro Se (Nonprisoner) Consent to Receive Documents Electronically:

☑ Yes   ☐ No

If you do consent to receive documents electronically, submit the completed form with your
complaint. If you do not consent, please do not attach the form.

# Affidavit of Truth and Facts, 07/15/2022

## RECONSIDERATION NOTICE

### FROM: Shartisha Williams, and, Shartisha@gmail.com

### here and after "Affiant"

TO: NEW YORK CITY HEALTH AND HOSPITALS CORPORATION OFFICE OF LEGAL AFFAIRS, CLAIMS DIVISION LOCATED 346 BROADWAY, ROOM 1126 NEW YORK, NEW YORK 10013

TO: Mitchell H. Katz, MD President and Chief Executive Officer LOCATED 125 Worth Street New York, NY 10013

TO: Ashwin Vasan , M.D., PhD COMMISSIONER LOCATED 50 water street 7th floor new york ny 10004

TO: The DEPT NEW YORK CITY HEALTH AND HOSPITAL LOCATED AT 260 Brielle Ave Staten Island NY 10314 AND

Commissioner  Office of EEO and Diversity & Inclusion (EDI) 59 maiden Lane New York, NY 10038 T. 212.839.6600 f.

212. 839.6611. and to: www.nycgov/dot and the Officials at:  CC Zemsky,Czizik, Karen <zemskyk@nychhc.org\

Akhrina,Anna <akhrinna@nyhhc.org>; Dumlao. Teresita><sup>dumlaot@nychhc.org></sup>; HRSS Leave Administration

<HRssleaveAccomodation@nychhc.org>, COVID Vaccine Accommodation <C0VIDVaccineAccomnpdation@nycfrhc.org>

SUBJECT RELIGIOUS EXEMPTION DECISION

A-Affiant has been an NEW YORK CITY HEALTH AND HOSPITAL CARE INVESTIGATOR employee since September 25, 2017affiant has 4years and 2 months within the NEW YORK CITY HEALTH AND HOSPITAL before being wrongfully terminated without any fault of affiant.

Affiant is grateful for Affiant experience as an NEW YORK CITY HEALTH AND HOSPITAL employee. Affiant respectfully request that a reasonable RECONSIDERATION and a corporate accountability is accommodated in this Religious Exemption Denial with Complete Reconsideration and Accountability and reversal to the herein matter.

The law and the Company policy permits the NEW YORK CITY HEALTH AND HOSPITAL Commissioner and The Office of EEO and Diversity & Inclusion (EDI) to revisit and provide accommodation as requested and to make any and all adjustments as necessary in this Religious Exemption Denial and Reconsideration and Accountability matter.

B-Affiant demands for RECONSIDERATION and demands corporate accountability is to be held with the re-consideration fairly and amicably with the inclusion of the affiant's unalienable rights, which is supported by the United States Constitution.

C-Affiant Demands all contents of this affidavit to be held in confidentiality as to the affiant's private beliefs, thoughts, feelings and sentiments that affiant does not shared in casual public conversation.

D-Affiants current employment status requires RECONSIDERATION because Affiant's right to Due Process has been Violated in this matter affiant and further affiant states in 1- thru 35 below with other violations and conditional laws being violated.

1-Affiants is continuing to stand on affiant's religious exemption from the unlawful New York State recent mandate for employees also having to have to submit to a vaccination that Constitutional Law protects all American Citizens against.

2-Affiant believes that Affiant's body is a temple of divine accord, and Affiant must do no harm to self, affiant must honor affiant's beliefs as well as Affiant must honor and protect affiant's auto-immune condition which is currently healthy.

3-Affiant regularly limits what Affiants choose to put into and on Affiants body.

Affiant states that based on the reactions and ramification of those choices. Affiant further states that these limitations also include, but is not limited to, food, beverages, soaps and authorized medications and/or un authorized medications, or un authorized medical prescriptions orally or being injected into affiants body.

4-Affiants believes due to the most current medical information from the CDC The current vaccines have also not been tested for long-term adverse reactions.

© undersigned 2022 **Shartisha Williams**, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

5-Affiants personal religious/spiritual conscience, convictions and beliefs compel Affiants to abstain from taking unconditional vaccinations. Since it is Affiants belief, Affiants must do the least amount of harm possible to self, and affiant must act in the goodwill of Affiants self and to affiant's family or others in the human existence race;

6-Affiants stands on the Constitutional Rights, Human Rights, Civil Rights, and affiant stands on the first amendment, though 27 amendment, and the bill of Rights as protection against unlawful vaccines mandates.

7-Affiant Constitutional Rights, Human Rights, Civil Rights, rights under the first amendment, though 27 amendment, and affiants Rights under the bill of Rights would be compromised by the forced associating of taking the vaccines.

8-Affiant's Constitutional Rights, Human Rights, Civil Rights, rights under the first amendment, though 27 amendment, and affiant's Rights under the bill of Rights would be compromised by being terminated from work or employment as a result of not taking the unlawful vaccines.

9-Affiant states that In determining the consequences, Affiants have researched the effects of the vaccines in accordance with the LAW. Affiants is in accordance with the Constitutional Law, further affiants cannot ensure Affiant family finance safety if affiant takes the vaccine and becomes ill affiants family will be finically affected as a result.

10-Affiant's refusal be harmed as a result of affiant not being subject to take a vaccine shot that could potentially make affiant to becoming ill from the vaccines is not a lawful reason for affiants termination.

11-Affiants must refuse all vaccines to insure no harm to Affiants self.

12-Affiants must refuse all vaccines due to the Constitution Law being the law of the land, and the Law protecting American Citizens from any/all unlawful mandates. Affiant willing stands on the Supreme Law of the Land

13-Affiants stand on the protection of the Constitutions LAW which is the supreme Law of the Land and that Law shall with its god given rights protect all U.S. American Consumers.

14-Affiants stands on affiant's Civil Right, and Human Rights and Conditional Rights in support the Affiants decision to be extremely uncomfortable of the ungodly thoughts of taking the unlawful vaccines.

15-Affiant states that in reviewing the outcomes on who have been vaccinated; as a result of affiant's reviewing the outcomes which public record reveals tens of hundreds of thousands instances of adverse reactions ranging from mild to severe, Tens of Hundreds of Thousands of which was placed in the Intensive Care Unit.

16-Affiant personally knows of other results of friends and family members that are currently dealing with side effects where it is unknown if the duration of these effects remains short-term or will be long-term.

17-Affiant believes seeing the results of the vaccines reactions coupled with affiant's own personal knowledge and medical information related to the vaccines and the reported deaths. due to the unconstitutional vaccines in recent vaccines Medical reporting.

18-Affiant can confidently conclude that taking the vaccine will/may cause affiant to cause unnecessary harm to affiant's body may/cause damage to any future children affiant my have or want to have.

19-Affiant further, asserts that affiant's individual actions and precautions taken during the social distancing, affiant is employing proper hygiene practices affiant is remaining indoors at home as much as possible with the best holistic, spiritual, herbs and natural spices used for centuries in my religion and culture as found in other religious beliefs and cultures using natural remedies for illness preventive measures and to consume for both affiant's and affiants families Biological, Spiritual, Mental, and or affiant's Physical well-being.

20-Affiants states affiant's Civil right and Human Rights are being violated as a result in this Religious Exemption Denial and Reconsideration and Accountability matter.

21-Reconsideration and Accountability is being requested to reconsider the DENIAL OF REASONABLE ACCOMMODATION REQUEST To be completed by Deciding Official, The Deciding Officials Names are: ____Commissioner Office of EEO and Diversity & Inclusion (EDI) and the Official Benjamin Graham. and any other person(s) that are the makers of an unlawful and unconstitutional decisions against the affiant, in this Religious Exemption Denial and Reconsideration and Accountability matter.

22-Reconsideration and Accountability is being requested because the affiant has been violated of sincerely held religious belief which prevented affiant from receiving the COVID vaccine, with the Basis for reasonable accommodation request which was first

© undersigned 2022 **Shartisha Williams**, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

# Affidavit of Truth and Facts, 07/15/2022

## RECONSIDERATION NOTICE

### FROM: Shartisha Williams, and, Shartisha@gmail.com

### here and after "Affiant"

TO: NEW YORK CITY HEALTH AND HOSPITALS CORPORATION OFFICE OF LEGAL AFFAIRS, CLAIMS DIVISION LOCATED 346 BROADWAY, ROOM 1126 NEW YORK, NEW YORK 10013

TO: Mitchell H. Katz, MD President and Chief Executive Officer LOCATED 125 Worth Street New York, NY 10013

TO: Ashwin Vasan , M.D., PhD COMMISSIONER LOCATED 50 water street 7th floor new york ny 10004

TO: The DEPT NEW YORK CITY HEALTH AND HOSPITAL LOCATED AT 260 Brielle Ave Staten Island NY 10314 AND

Commissioner  Office of EEO and Diversity & Inclusion (EDI) 59 maiden Lane New York, NY 10038 T. 212.839.6600 f.

212. 839.6611. and to: www.nycgov/dot and the Officials at:  CC Zernsky,Czizik, Karen <zemskyk@nychhc.org\

Akhrina,Anna <akhrinna@nyhhc.org>; Dumlao. Teresita>dumlaot@nychhc.org>; HRSS Leave Administration

<HRssleaveAccomodation@nychhc.org>, COVID Vaccine Accommodation <C0VIDVaccineAccomnpdation@nycfrhc.org>

SUBJECT RELIGIOUS EXEMPTION DECISION

A-Affiant has been an NEW YORK CITY HEALTH AND HOSPITAL CARE INVESTIGATOR employee since September 25, 2017affiant has 4years and 2 months within the NEW YORK CITY HEALTH AND HOSPITAL before being wrongfully terminated without any fault of affiant.

Affiant is grateful for Affiant experience as an NEW YORK CITY HEALTH AND HOSPITAL employee. Affiant respectfully request that a reasonable RECONSIDERATION and a corporate accountability is accommodated in this Religious Exemption Denial with Complete Reconsideration and Accountability and reversal to the herein matter.

The law and the Company policy permits the NEW YORK CITY HEALTH AND HOSPITAL Commissioner and The Office of EEO and Diversity & Inclusion (EDI) to revisit and provide accommodation as requested and to make any and all adjustments as necessary in this Religious Exemption Denial and Reconsideration and Accountability matter.

B-Affiant demands for RECONSIDERATION and demands corporate accountability is to be held with the re-consideration fairly and amicably with the inclusion of the affiant's unalienable rights, which is supported by the United States Constitution.

C-Affiant Demands all contents of this affidavit to be held in confidentiality as to the affiant's private beliefs, thoughts, feelings and sentiments that affiant does not shared in casual public conversation.

D-Affiants current employment status requires RECONSIDERATION because Affiant's right to Due Process has been Violated in this matter affiant and further affiant states in 1- thru 35 below with other violations and conditional laws being violated.

1-Affiants is continuing to stand on affiant's religious exemption from the unlawful New York State recent mandate for employees also having to have to submit to a vaccination that Constitutional Law protects all American Citizens against.

2-Affiant believes that Affiant's body is a temple of divine accord, and Affiant must do no harm to self, affiant must honor affiant's beliefs as well as Affiant must honor and protect affiant's auto-immune condition which is currently healthy.

3-Affiant regularly limits what Affiants choose to put into and on Affiants body.

Affiant states that based on the reactions and ramification of those choices. Affiant further states that these limitations also include, but is not limited to, food, beverages, soaps and authorized medications and/or un authorized medications, or un authorized medical prescriptions orally or being injected into affiants body.

4-Affiants believes due to the most current medical information from the CDC The current vaccines have also not been tested for long-term adverse reactions.

© undersigned 2022 Shartisha Williams, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

5-Affiants personal religious/spiritual conscience, convictions and beliefs compel Affiants to abstain from taking unconditional vaccinations. Since it is Affiants belief, Affiants must do the least amount of harm possible to self, and affiant must act in the goodwill of Affiants self and to affiant's family or others in the human existence race;

6-Affiants stands on the Constitutional Rights, Human Rights, Civil Rights, and affiant stands on the first amendment, though 27 amendment, and the bill of Rights as protection against unlawful vaccines mandates.

7-Affiant Constitutional Rights, Human Rights, Civil Rights, rights under the first amendment, though 27 amendment, and affiants Rights under the bill of Rights would be compromised by the forced associating of taking the vaccines.

8-Affiant's Constitutional Rights, Human Rights, Civil Rights, rights under the first amendment, though 27 amendment, and affiant's Rights under the bill of Rights would be compromised by being terminated from work or employment as a result of not taking the unlawful vaccines.

9-Affiant states that In determining the consequences, Affiants have researched the effects of the vaccines in accordance with the LAW. Affiants is in accordance with the Constitutional Law, further affiants cannot ensure Affiant family finance safety if affiant takes the vaccine and becomes ill affiants family will be finically affected as a result.

10-Affiant's refusal be harmed as a result of affiant not being subject to take a vaccine shot that could potentially make affiant to becoming ill from the vaccines is not a lawful reason for affiants termination.

11-Affiants must refuse all vaccines to insure no harm to Affiants self.

12-Affiants must refuse all vaccines due to the Constitution Law being the law of the land, and the Law protecting American Citizens from any/all unlawful mandates. Affiant willing stands on the Supreme Law of the Land

13-Affiants stand on the protection of the Constitutions LAW which is the supreme Law of the Land and that Law shall with its god given rights protect all U.S. American Consumers.

14-Affiants stands on affiant's Civil Right, and Human Rights and Conditional Rights in support the Affiants decision to be extremely uncomfortable of the ungodly thoughts of taking the unlawful vaccines.

15-Affiant states that in reviewing the outcomes on who have been vaccinated; as a result of affiant's reviewing the outcomes which public record reveals tens of hundreds of thousands instances of adverse reactions ranging from mild to severe, Tens of Hundreds of Thousands of which was placed in the Intensive Care Unit.

16-Affiant personally knows of other results of friends and family members that are currently dealing with side effects where it is unknown if the duration of these effects remains short-term or will be long-term.

17-Affiant believes seeing the results of the vaccines reactions coupled with affiant's own personal knowledge and medical information related to the vaccines and the reported deaths. due to the unconstitutional vaccines in recent vaccines Medical reporting.

18-Affiant can confidently conclude that taking the vaccine will/may cause affiant to cause unnecessary harm to affiant's body may/cause damage to any future children affiant my have or want to have.

19-Affiant further, asserts that affiant's individual actions and precautions taken during the social distancing, affiant is employing proper hygiene practices affiant is remaining indoors at home as much as possible with the best holistic, spiritual, herbs and natural spices used for centuries in my religion and culture as found in other religious beliefs and cultures using natural remedies for illness preventive measures and to consume for both affiant's and affiants families Biological, Spiritual, Mental, and or affiant's Physical well-being.

20-Affiants states affiant's Civil right and Human Rights are being violated as a result in this Religious Exemption Denial and Reconsideration and Accountability matter.

21-Reconsideration and Accountability is being requested to reconsider the DENIAL OF REASONABLE ACCOMMODATION REQUEST To be completed by Deciding Official, The Deciding Officials Names are: _____Commissioner Office of EEO and Diversity & Inclusion (EDI) and the Official Benjamin Graham. and any other person(s) that are the makers of an unlawful and unconstitutional decisions against the affiant, in this Religious Exemption Denial and Reconsideration and Accountability matter.

22-Reconsideration and Accountability is being requested because the affiant has been violated of sincerely held religious belief which prevented affiant from receiving the COVID vaccine, with the Basis for reasonable accommodation request which was first

© undersigned 2022 **Shartisha Williams**, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

SUBMITTED September 14, 2021, WAS denied on or about September 17, 2021 until November 26th 2021 because affiant poses an undue burden on the System, but the system has no evidence to support such action causing affiant character to be damage for standing on affiants religious beliefs and lost of wages and the ripple affect that caused affiant continuous finical damage such as: Rent arrears, late fees, an interest on Credits card Payment, late payments and deferred payments to Utility service providers such as: cellular provider, any/ all other monthly bills that were depending on affiant's salary of $47,705 to provide payment of the said services, affiant demand full payment of affiants salary of $47,705 to be compensated past year 2021 the present 2022 and each year until pension and retirement meaning the future wage compensation ." FUTURE MEANING REMAINDER OF AFFIANTS CONTRACT OF 21_ YEARS OF SERVICE INCLUDING ANY/ALL PENSION FUNDS EXPECTED AND CONTRACTED TO BE PAID AT THE SIGNING OF EMPLOYMENT CONTRACT" IN WHICH AFFIANT IS NOW DUE FOR THE WRONGFUL TERMINATION AND IN WHICH AFFIANT DID NOT CAUSE ANY BREACH OF DUTY NOR WAS AFFIANT AT ANY FAULT FOR PROTECTING AFFIANTS RELIGIOUS BELIEFS.

23-AFFIANT demands accommodations for compensative damages and punitive Damages be paid as a Amicable Resolution to avoid a law suit in federal Court for the Violation made against affiant by the individuals and collective amounts the following: DEPT NEW YORK CITY HEALTH AND HOSPITAL LOCATED AT 125 Worth Street New York, NY 10013 and 260 Brielle Ave Staten Island NY 10314 AND Commissioner Office of EEO and Diversity & Inclusion (EDI) 59 maiden Lane New York, NY 10038 T. 212.839.6600 f. 212. 839.6611. and to: www.nycgov/dot and the Officials at:  CC Zemsky,Czizik, Karen <zemskyk@nychhc.org\ Akhrina,Anna <akhrinna@nyhhc.org>; Dumlao. Teresita>dumlaot@nychhc.org>; HRSS Leave Administration <HRssleaveAccomodation@nychhc.org>, COVID Vaccine Accommodation <C0VIDVaccineAccomnpdation@nycfrhc.org> SUBJECT RELIGIOUS EXEMPTION DECISION against affiant

24-Affiant states that decision makers from NYCHHC, President DR. Mitchell Katz, Sr.Vice President Human Resources Yvette Villanueva those behind the Covid-19 Vaccine enforcements along with the decision making of Benjamin Graham to be included with an unlawful and unconstitutional decision that is Affecting affiants job functions, job pay, job security, and is affecting affiants ability to be employed from home, and or at the work place due to Affiants religious/spiritual beliefs about not accepting taking the vaccines,

25-Affiant states that and the Official supervisor Teresita Dumlao, Ingrid Gobins and  Benjamin Graham made an unlawful and unconstitutional decision that is the cause of affiant's anxiety. Affiant is now seeking council and therapy treatments as result of being stressed out due to affiant's religious/spiritual beliefs about vaccines, stress and aggravation from the lack of employment stress and aggravation with experiencing the on ongoing threat of vaccines shots not taking the vaccines and stress and aggravation from being restricted from the freedom and right to travel to work to perform affiant's job functions.

26-Affiant is now asserting Conditional Law, Civil Rights, Human Rights, and that Conditional Law,  be the best course of action for affiant's continued Job Security and Affiant's health and personal safety, as a result of this Religious Exemption Denial and Reconsideration and Accountability matter.

27-Reconsideration and Accountability requested and demanded this will allow affiant to safely complete 100% of affiant's job functions accurately, timely and successfully without distraction or feeling ostracized, due to the protection of Constitutional Rights, Human Rights,  Civil Rights,  physical, spiritual, emotional and mental well-being.

28-Affiant until wrongfully terminated has successfully and effectively carried out affiants job duties and responsibilities at all times and times during this Religious Exemption Denial and Reconsideration and Accountability matter.

29-Affiant is prepared to file a EX PARTE YOUNG 209 U.S. 123 (1908) claim, a Tort Claim, Civil and Criminal charges against those who are in violation of affiants Constitutional Rights. Any one violating USC title 18 1983. Under Federal law protects each individual's rights to one's own sincerely held religious, ethical or moral beliefs. There is no requirement for an individual to belong to any traditional, organized or recognized denomination of any faith.

30-Affiant salary was $47,705 as Health and Hospital Investigator since September 25, 2017affiant has 4years and 2 months, affiant expected to work as a Health and Hospital Investigator before affiant planned to retire.

Affiant is grateful for Affiant experience as a Health and Hospital Investigator employee. Affiant respectfully request that a

reasonable RECONSIDERATION and a corporate accountability is accommodated in this matter. The law permits the

© undersigned 2022 Shartisha Williams, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

Health and Hospital Commissioner Office of EEO and Diversirty & Inclusion (EDI) to revisit accommodation requests and adjust as necessary in this Religious Exemption Denial and Reconsideration and Accountability matter, to accommodate and compensate affiant for time and currency lost past present and future payment due to affiant, because of false termination on NOVEMBER 27TH 2021.

31-Affiant states that On Monday October 4th, at 9 AM Affiant emailed www.nycgov/dot and the Officials at:  CC Zemsky,Czizik, Karen <zemskyk@nychhc.org\ Akhrina,Anna <akhrinna@nyhhc.org>; Dumlao. Teresita>dumlaot@nychhc.org>; HRSS Leave Administration <HRssleaveAccomodation@nychhc.org>, COVID Vaccine Accommodation <C0VIDVaccineAccomnpdation@nycfrhc.org> SUBJECT RELIGIOUS EXEMPTION DECISION 2 message affiant email request that affiant continue working from home affiant was working as a biller and from home for 18 months and affiants job was not dealing directly with the public and did not cause a hardship for fellow co workers and or the Health and Hospital despite the September 27th 2021 approval to work remote and being approved for affiant's application for reasonable accommodation for Religious Request.

32-Affiant states that on October 22 2021 around 7;19 Pm Affiant received an email from  HR Information <HRinformation@nychhc.orgReply-ToHRinformation<HRInformation@nyc.org  with notice that the Systems's Office of Equal Employment Opportunity (OEEO approved your request for Religious Exemptions from the COVID -19 Vaccination requirements and NO ACTION WOULD BE TAKEN IN CONNECTION WITH AFFIANT EMPLOYMENT HOWEVER affiant was to be aware of the with an option to resign.

Affiant states that on October 27 2021 around 8:31pm, Affiant emailed HR Information <HRInformation@nychhc.org> cc

Karen <zemskyk@nychhc.org>,Anna <akhrinaa@nychhc.org>,

Teresita <dumlaot@nychhc.org>,HRSS Leave Administration <HRSSLeaveAdministration@nychhc.org>, COVID Vaccine

Accommodation <COVIDVaccineAccommodation@nychhc.org>, mmelo@cchr.nyc.gov

Again, requesting reconsideration of affiant accommodation request to continue working remotely as it is not an undue

burden.

Affiant states that on October 29th at10:54 am An email was received by affiant from **COVID Vaccine Accommodation**

<COVIDVaccineAccommodation@nychhc.org>

to: Tisha Williams <shartisha@gmail.com>,
HR Information <HRInformation@nychhc.org>

cc: "Zemsky-Czizik, Karen" <zemskyk@nychhc.org>,
"Akhrina, Anna" <akhrinaa@nychhc.org>,
"Dumlao, Teresita" <dumlaot@nychhc.org>,

© undersigned 2022 **Shartisha Williams**, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

HRSS Leave Administration <HRSSLeaveAdministration@nychhc.org>,

COVID Vaccine Accommodation <COVIDVaccineAccommodation@nychhc.org>, "mmelo@cchr.nyc.gov" <mmelo@cchr.nyc.gov>

That Office of Equal Employment Opportunity (EEO) approved your request for Religious Exemptions from the COVID -19
Vaccination requirement and leave of absence

because affiant poses an undue burden on the System, but the system has no evidence to support such action causing affi-

ant character to be damaged

33-Affiant states that on Tuesday Nov 16th 2021 at 12;07 pm
An email was received by affiant from HR Information <HRinformation@nychhc.orgReply-ToHRinformation<HRInfor-
mation@nyc.orgCc"ZemskyCzizky-,Karen"<zemsks@nychhc.org,Veles,Gira">gina,Ve-
lez@nychhc.org"Akhrina,Anna<akhrinaa@nychhc.org,Sinclair,Christopher"<sinclaic3@nyvhhc.org Stating that The Office
of the EEO has advised NYCHH that affiant approve of leave of absence and accommodations would come to an end on
Saturday November 27th 2021 if affiant refuse to get vaccinated.
 Exhibit # two

Affiant states that on November 22, 2021 around 1:34 pm affiant emailed

HR Information <HRInformation@nychhc.org>

© undersigned 2022 **Shartisha Williams**, and, HYPERLINK
"mailto:kenyadawilliams13@gmail.com"Shartisha@gmail.com
Certified true copy of the Original by the document custodian

cc: "Zemsky-Czizik, Karen" <zemskyk@nychhc.org>, "Velez, Gina" <Gina.Velez@nychhc.org>, "Akhrina, Anna"
<akhrinaa@nychhc.org>, "Sinclair, Christopher" <sinclaic3@nychhc.org>, Teresita <dumlaot@nychhc.org>,

COVID Vaccine Accommodation <COVIDVaccineAccommodation@nychhc.org>,
HRSS Leave Administration <HRSSLeaveAdministration@nychhc.org>

Subject Re: Accommodation Expiration Notice that The State of NY is committed to ensuring Equal Employment Opportunity

for persons who engage in religious observance or practice. To this end, it is the

state's policy to provide reasonable accommodation for religious observance or practices. This policy is based on NY
STATE HUMAN RIGHTS LAW, FEDERAL Civil rights act of 1964,TITLE VII, in all applicable execute orders and memo-
randa.

Thus, I herein request an extension to my approved reasonable accommodation. Constitutional Rights never expire, nor
can my company infringe on that protected Constitutional Right. My accommodation does not constitute an undue hard-
ship nor interferes with my ability to perform the essential functions of my position in which I am employed. My accommo-
dation does not pose an economic hardship to the agency. By honoring the extension of my reasonable accommodation
request, the agency avoids unnecessarily compromising my requirements of my religious beliefs/exemption.

© undersigned 2022 **Shartisha Williams**, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

The Agency has accommodated its employees to tele- work during this unforeseen time, I too should be afforded this accommodation, to telework

34-Affiant states that that on Mon, Nov 22, 2021 at 1:34 PM

Subject: Re: Accommodation Expiration Notice affiant emailed to To: HR Information <HRInformation@nychhc.org>Cc: Zemsky-Czizik, Karen <zemskyk@nychhc.org>, Velez, Gina <Gina.Velez@nychhc.org>, Akhrina, Anna <akhrinaa@nychhc.org>, Sinclair, Christopher <sinclaic3@nychhc.org>, Teresita <dumlaot@nychhc.org>, COVID Vaccine Accommodation <COVIDVaccineAccommodation@nychhc.org>, HRSS Leave Administration <HRSSLeaveAdministration@nychhc.org> In regards: to the State of NY is committed to ensuring Equal Employment Opportunity for persons who engage in religious observance or practice. To this end, it is the state's policy to provide reasonable accommodation for religious observance or practices. This policy is based on NY STATE HUMAN RIGHTS LAW, FEDERAL Civil rights act of 1964,TITLE VII, in all applicable execute orders and memoranda. Thus, I herein request an extension to my approved reasonable accommodation. Constitutional Rights never expire, nor can my company infringe on that protected Constitutional Right. My accommodation does not constitute an undue hardship nor interferes with my ability to perform the essential functions of my position in which I am employed. My accommodation does not pose an economic hardship to the agency. By honoring the extension of my reasonable accommodation request, the agency avoids unnecessarily compromising my requirements of my religious beliefs/exemption.The Agency has accommodated its employees to tele- work during this unforeseen time, I too should be afforded this accommodation, to telework. Respectfully, Shartisha Williams

35-Affiant states that that on November 24, 2021 affiant emailed HR Information <HRinformation@nychhc.org affiant states that Covid vaccine would be detrimental to affiants body chemistry and request the that a Medical Exemption from affiant's healthcare doctor Dr Mittman.
Affiant states that on November 26, 2021 at 9:28 am email was received from HRinformation@nychhc.org medical letter forwarded to Covid Vaccine Accomodation@nychhc.org

**Reconsideration and Accountability request to reconsider due to the below case law on COVID-19 vaccines and public alerts of fraud and vaccine health problems:**
1-United States Court of Appeals for the Fifth Circuit
No. 21-60845United States Court of Appeals Fifth Circuit
FILED November 12, 2021 Lyle W. Cayce Clerk
2- The CDC to hold 'emergency meeting' on heart inflammation after COVID-19 vaccines BY JORDAN WILLIAMS - 06/11/21 08:00 AM EDT

3-a- Last Updated Nov. 5, 2021 Content source: National Center for Immunization and Respiratory Diseases (NCIRD), Division of Viral Diseases Myocarditis and Pericarditis After mRNA COVID-19 Vaccination

3-b-Serious side effects that could cause a long-term health problem are extremely unlikely following any vaccination, including COVID-19 vaccination. Vaccine monitoring has historically shown that side effects generally happen within six weeks of receiving a vaccine dose. For this reason, the U.S. Food and Drug Administration (FDA) collected data on each of the authorized COVID-19 vaccines for a minimum of two months (eight weeks) after the final dose. CDC is continuing to monitor the safety of COVID-19 vaccines even now that the vaccines are in use.

4-FDA adds a warning to Covid-19 vaccines about risk of heart inflammation By Lauren Mascarenhas Updated 6:28 AM ET, Sat June 26, 2021

5-EMA finds possible link between mRNA COVID-19 vaccines and myocarditis & pericarditis 12-Jul-2021 By Rachel Arthur The safety committee of the European Medicines Agency (EMA) has concluded that myocarditis and pericarditis can occur in very rare cases following vaccination with the COVID-19 vaccines from Pfizer and Moderna. HTTPS://WWW.BIOPHARMA-REPORTER.COM/ARTICLE/2021/07/12/EMA-FINDS-POSSIBLE-LINK-BETWEEN-PFIZER-MODERNA-COVID-19-VACCINES-AND-MYOCARDITIS-PERICARDITIS

6-A dozen governors have signed legislation restricting COVID-19 vaccine mandates in their states, according to a Sept. 9 report from the National Academy for State Health Policy. Editor's Note: This webpage was updated Oct. 12 and will continue to be updated.

© undersigned 2022 **Shartisha Williams,** and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

7-A federal judge temporarily blocked the state of New York on Tuesday from forcing medical workers to be vaccinated after a group of health care workers sued, saying their Constitutional rights were violated because the state's mandate disallowed religious exemptions.

8-Judge David Hurd in Utica issued the order after 17 health professionals, including doctors and nurses, claimed in a lawsuit Monday that their rights were violated with a vaccine mandate that disallowed the exemptions.

9-The judge gave New York State until Sept. 22 to respond to the lawsuit in federal court in Utica. If the state opposes the plaintiffs' request for a preliminary court order blocking the vaccine mandate, a Sept. 28 oral hearing will occur. "It can be a personal, sincerely held religious belief which arises from the very nature of freedom of religion articulated in the First Amendment," Domenique Camacho Moran, a labor attorney at New York-based law firm Farrell Fritz.

10-**Arizona:** On April 19, Republican Gov. Doug Ducey issued an order prohibiting the state from requiring people to prove their COVID-19 vaccination status to enter a business, building or area or to receive a public service. However, healthcare institutions can request COVID-19 vaccination status documentation of patients, residents, employees or visitors.
On June 30, Mr. Ducey signed a bill requiring employers to provide reasonable accommodation to employees with sincerely held religious beliefs, practices or observances that prevent the employee from getting the COVID-19 vaccine unless the accommodation would pose an undue hardship to the operation of the business. The bill allows healthcare institutions to require employees to be vaccinated.

11-**Arkansas:** On April 28, the state enacted a bill prohibiting the state, political subdivisions of the state or public officials from mandating vaccination as a condition of employment. These agencies may not discriminate against or coerce individuals who refuse a COVID-19 vaccine by withholding opportunities for career advancement, wage increases or insurance discounts.

12-**Georgia:** On May 25, Republican Gov. Brian Kemp said that no state agency can require proof of COVID-19 vaccination as a condition of employment by the state, conducting business with the state or enjoying other rights provided by the state.

13-**Florida:** On April 2, Republican Gov. Ron DeSantis said businesses are prohibited from requiring customers to verify a COVID-19 vaccination status or post-transmission recovery to gain access to the business. Effective Sept. 16, the state will give $5,000 fines to any public or private entity that requires proof of vaccination, News 4 Jax reported. Since asking for proof of vaccination is part of a vaccine mandate, some companies may pay millions of dollars in fines.

14-**Indiana:** On April 29, Republican Gov. Eric Holcomb signed a law prohibiting state or local governments from requiring anyone, including employees, to show proof of vaccination.

15-**Montana:** On May 7, Republican Gov. Greg Gianforte signed a bill that prohibits discrimination based on vaccination status. This includes prohibiting an employer or government entity to refuse employment to a person or to discriminate against a person in compensation or in a term, condition or privilege of employment based on the person's vaccination status. Additionally, an individual may not be required to receive any vaccine whose use is allowed under an emergency use authorization or any vaccine undergoing safety trials.

16-**New Hampshire:** On July 26, Republican Gov. Chris Sununu signed a bill stating that employers may only mandate immunization as a condition of employment when a "direct threat" exists. A "direct threat" is defined as a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. State hospitals are exempt from the mandate

17-**North Dakota:** On May 7, Republican Gov. Doug Burgum signed a bill prohibiting state government entities from requiring a private business to obtain documentation to verify an individual's vaccination status. The bill exempts healthcare organizations from the ban.

18-**Oklahoma:** On May 28, Republican Gov. Kevin Stitt issued an order prohibiting state agencies from requiring that people show proof of vaccination to enter public buildings. The order doesn't apply to employees working in patient-facing settings.

19-**Tennessee:** On May 25, Republican Gov. Bill Lee signed a bill that prohibits a state agency, department or political subdivision from mandating COVID-19 vaccines.

20-**Texas:** Gov. Greg Abbott issued an executive order Oct. 11 banning any entity in the state, including private employers, from enforcing COVID-19 vaccine mandates. The order states that "no entity in Texas" can enforce vaccination against anyone, including an employee or consumer, who objects "for any reason of personal conscience, based on a religious belief, or for medical reasons, including prior recovery from COVID-19."

21-**Utah:** On March 16, Republican Gov. Spencer Cox signed a bill that prohibits state agencies from requiring people to get a COVID-19 vaccine as a condition of employment. However, the bill does not apply to employees who work in a medical setting and are required to receive vaccinations to perform the assigned duties and responsibilities of the job.

© undersigned 2022 **Shartisha Williams**, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

22-Latest articles on workforce: Colorado reactivates crisis standards of care for healthcare staffing a quarter of US workers want a job change in next 18 months, report finds. Texas health system offers $1,500 referral bonuses to public

23-UN CONSTITUTIONAL LAW by the CDC

Public Health Professionals Gateway Public Health Law

24-On January 21, 2020, CDC launched its agency wide response to the COVID-19 pandemic. It has been the largest response to any disease outbreak in CDC's history. Find out more about what CDC is doing to slow the spread of COVID-19 and to protect people's lives and health.

25-Vaccination Laws

Vaccine-preventable disease levels are at or near record lows. CDC works closely with public health agencies and private partners to improve and sustain immunization coverage and to monitor the safety of vaccines. One tool used to maintain low rates of vaccine preventable disease is vaccination law. State vaccination laws include vaccination requirements for children in public and private schools and daycare settings, college/university students, and healthcare workers and patients in certain facilities. State laws also affect access to vaccination services by determining whether providing vaccinations to patients is within the scope of practice of certain healthcare professionals. The Public Health Law Program provides selected resources for public health practitioners and their legal counsel on state vaccination laws.

26-State Healthcare Worker and Patient Vaccination Laws

Healthcare facilities across the country are increasingly requiring healthcare workers to be vaccinated for certain diseases in an effort to reduce outbreaks of vaccine-preventable diseases. In some instances, facilities are establishing these requirements due to mandates in state statutes and regulations. These PHLP menus examine state healthcare facility vaccination laws for the following vaccine-preventable diseases:

27-Affiant's objection to the COVID-19 Vaccines Affiant's also object to the J&J vaccine, asserting that aborted fetal cell lines were used in both its development and production. They allege that the use of fetal cell lines to develop the vaccines runs counter to their sincerely held religious beliefs that cause them to oppose abortion. Affiant's objection to receiving the COVID-19 vaccines based on their stated belief that "life is sacred from the moment of conception" ECF No. 1 at ¶

28- They contend that the development of the three COVID-19 vaccines employed or benefitted from the cell lines of aborted fetuses. Specifically, the Plaintiffs object to the Moderna and Pfizer vaccines because both are MRNA vaccines which, the Plaintiffs claim, "have their origins in research on aborted fetal cells lines." ECF No. 1 at ¶ 65.

29-Affiant's also object to the J&J vaccine, asserting that aborted fetal cell lines were used in both its development and production. They allege that the use of fetal cell lines to develop the vaccines runs counter to their sincerely held religious beliefs that cause them to oppose abortion. The Affiant's Reconsideration seeking preliminary injunctive relief, from the company employing DOE Chancellor Meisha Porter, Division of human capital, Super intendant Louissaint Ketler and Michael Mulgrew the union representatives who have challenged and denied the sincerity of the Affiant's asserted religious beliefs or that those beliefs are the reason for the Affiant's refusal to be vaccinated. Affiant therefore treat these facts as established for purposes of deciding the Reconsideration.

30-Affiant's also object to the J&J vaccine, asserting that aborted fetal cell lines were used in both its development and production. They allege that the use of fetal cell lines to develop the vaccines runs counter to their sincerely held religious beliefs that cause them to oppose abortion in their responses to the Affiant's Reconsideration seeking preliminary injunctive relief, DOE Chancellor Meisha Porter, Division of human capital, Super intendant Louissaint Ketler and Michael Mulgrew the union representatives have challenged and denied the sincerity of the Plaintiffs' asserted religious beliefs or that those beliefs are the reason for the Plaintiffs' refusal to be vaccinated. DOE Chancellor Meisha Porter, Division of human capital, Super intendant Louissaint Ketler and Michael Mulgrew the union representatives therefore must treat these facts and truths as established for purposes of deciding the Reconsideration.

31-Article I, Section 10 of the U.S. Constitution, which holds that "no State may pass any law impairing the obligation of contracts,"

32-Employment Division, Department of Human Resources of Oregon v. Smith (1990) By John R. Hermann Related cases in Native American Religion Alfred Smith was one of two men fired from their jobs as private drug rehabilitation counselors for ingesting peyote as part of a sacrament of the Native American Church. They both were denied unemployment benefits by the state of Oregon because they had violated a state criminal statute on drug use. The Supreme Court ruled that the state's law served a legitimate public interest in combating drug problems and Smith's and Black's free exercise rights were not violated. Although Smith lost, the case created so much national attention that Congress later strengthened protection for Native American religious practices. Smith was a 50-year adherent to Alcoholics Anonymous and worked to help others with alcohol and drug addictions. In Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872 (1990), the Supreme Court changed religious free exercise law dramatically by ruling that generally applicable laws not targeting specific religious practices do not violate the free exercise clause of

© undersigned 2022 Shartisha Williams, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

the First Amendment. The Court abandoned the compelling interest test that it had used in free exercise cases since 1963 in <u>Sherbert v. Verner</u>.

33-COVID Vaccines for Black Christians Aligning our Faith With Action Vaccines are safe and accessible, but they are also our individual decision to make. As Black Believers, we have to consider not just whether the vaccine aligns with out Christian convictions, but also the wellbeing of the Black community in America. COVID-19 vaccines have proven safe for all People of Color. And COVID-19 vaccine studies were the first ever to be racially representative of America. And they were developed by Black scientists like Dr. Kizzmekia Corbett. But even as the vaccines are proving safe and effective at decreasing the likelihood of severe sickness, new COVID-19 variants are hitting the unvaccinated Black community hard. The Black community's death rate from COVID-19 is 2x higher than the national average. And our hospitalization rate is nearly 3x higher. But the COVID-19 vaccine is decreasing the chances of both those unfortunate outcomes.

34-In the Bible, God promises to heal our people. By vaccinating, our Father has given us the opportunity to heal our communities and return to worship. But we have to be willing to take His outstretched hand.

### Amicable Resolution Remedy

Economic Damages are due as compensation and accommodation in the reconsideration intended to cover real costs that the DEPT NEW YORK CITY HEALTH AND HOSPITAL have caused as a result of the incident in question and the malicious, fraudulent, or grossly negligent behavior of said employees of the DEPT NEW YORK CITY HEALTH AND HOSPITAL. These damages may include Future: **Medical bills.** the DEPT NEW YORK CITY HEALTH AND HOSPITAL compensation will cover any/all medical bills—past, present, and future—directly related to the incident regarding the MISSED REVENUE and **Lost wages and lost benefits.** the DEPT NEW YORK CITY HEALTH AND HOSPITAL will provide compensation for wages lost in the immediate aftermath of your injury—and also for future wages AFFIANT cannot earn as a result of WRONGFUL TERMINATION, THE COMPENSATION FOR THIS WRONGDOING IS AFFIANT RECEIVING LIFELONG ongoing disability. If the DEPT NEW YORK CITY HEALTH AND HOSPITAL can't return AFFIANT to work, the DEPT NEW YORK CITY HEALTH AND HOSPITAL can also pursue providing affiant life long compensation for lost economic benefits like (but not limited to) retirement benefits or pensions, Other **Related economic losses.** transportation costs related to getting medical care, and the costs of in-home treatment is part of this personal injury Remedy FOR the DEPT NEW YORK CITY HEALTH AND HOSPITAL VIOLATING THE CONSUMER PROTECTION US CODE §1681o. Civil liability for negligent noncompliance one amongst several other violation deserving paying affiant punitive damages, for affiant being economically damages, subsequently causing affiant Physical <u>pain and suffering</u>, Emotional and mental anguish, Loss of consortium (inability to maintain an intimate relationship), Loss of companionship and society, Disfigurement and/or impairment, Loss of enjoyment of life because of non employment in the amount of Affiant's loss of income for anticipated Expenses Monthly Yearly 21 Yrs. of loss service and 3x the amount of damages for the loss service Totaling $30,711,025.80

**Affiant's loss of income for anticipated Expenses**
**Monthly**
**Yearly**
**21 Yrs. of loss service**
**3x the amount of damages for the loss service**
Mortgage
$1,585.20
$19,022.40
$399,470.40
$1,198,411.20
Electric
$175.17
$2,102.04.
$44,142.84
$132,428.52
Gas
$180.91
$2,170.92
$45,589.32
$136,767.96
Cell
$80.00

© undersigned 2022 <u>Shartisha Williams</u>, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

$960.00
$20,160.00
$60,480.00
Tax
$34.14
$409.68
$8,603.28
$25,809.84
Insurance
$389.98
$4,679.86
$98,274.96
$294,824.88
Water/ sewer
$5,758.77
$69,105.24
$1,451,210.04
$4,353,630.12
Internet/Satellite
$291.12
$3,493.44
$73,362.24
$220,086.72
Insurance/ Car
$156.27
$1,875.24
$39,380.04
$118,140.12
insurance/ equipment
$61.16
$733.92
$15,412.32
$46,236.96
Health
$34.99
$419.88
$8,817.48
$26,452.44
Lawn
$589.00
$7,068.00
$148,428.00
$445,284.00
Gas
$200.00
$2,400.00
$50,400.00
$151,200.00
Dentist
$200.00
$2,400.00
$50,400.00
$151,200.00
Dental
$2,940.00
$35,280.00
$740,880.00

© undersigned 2022 **Shartisha Williams**, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

$2,222,640.00
Subscriptions
$69.90
$838.80
$17,614.80
$52,844.40
Insurance/ auto
$271.44
$3,257.28
$68,402.88
$205,208.64
Tutor
$420.00
$5,040.00
$105,840.00
$317,520.00
Food
$600.00
$7,200.00
$151,200.00
$453,600.00
DMV/ state application
$205.00
$2,460.00
$51,660.00
$154,980.00
3 keys/ Program
$350.00
$4,200.00
$88,200.00
$264,600.00

Home Maintenance
$2,800.00
$33,600.00
$705,600.00
$2,116,800.00

Boiler Repair/Replacement
$8,700.00
$104,400.00
$2,192,400.00
$6,577,200.00

Emergency repair
$500.00
$6,600.00
$138,600.00
$415,800.00

Tachs exam
$65.00
$1,365.00
$4,095.00

St Francis HS
$11,300.00

© undersigned 2022 **Shartisha Williams**, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian

$135,600.00
$2,847,600.00
$8,542,800.00

Camp
$1,815.00
$21,780.00
$457,380.00
$1,372,140.00

Dental
$3,740.00
$44,880.00
$942,480.00
$2,827,440.00

**Total**
**$30,711,025.80**

THIS PART IS INTENTIONALLY  BLANK

EXHIBTS

Exhibit-1 COVIC -19 Understanding Quarantine and Isolation

Exhibit-2 ORDER OF THE COMMISSIONER OF HEALTH AND MENTAL HYGINE

Exhibit-3 Updated Guidance for City Agencies on Leave Policy Applicable During the Outbreak of Coronavirus Disease 2019 (COVID-19), eff. April 1, 2021

Exhibit-4_____ Commissioner Office of EEO WORKING IN THE OFFICE  COVID LETTER

Exhibit-5 REASONABLE ACCOMMODATION REQUEST EMAIL

© undersigned 2022 **Shartisha Williams**, and, Shartisha@gmail.com
**Certified true copy of the Original by the document custodian**

Exhibit-6 DENIAL OF REASONABLE ACCOMMODATION REQUEST

Exhibit-7 apparent, bald, bald-faced, barefaced, bright-line, broad, clear, clear-cut, crystal clear, decided, distinct, evident, lucid, luculent, luminous, manifested, nonambiguous, obvious, open-and-shut, palpable, patent, pellucid, perspicuous, plain, ringing, straightforward, transparent, unambivalent, unequivocal, unmistakable Evidence that affiant broke or breached any of the DEPT NEW YORK CITY HEALTH AND HOSPITAL Agencies Policy.

Exhibit–8 Article Pathologist Speaks Out About COVID Jab Effects

Exhibit-9 Hunter Doster, et.al., v Hon. Frank Kendall, et. Al. Ase No 1:22 cv 84 Court Grants Air Force Servce Members Relief from Shot Mandates

Exhibit-10-International news articles

Exhibit-11- One of Pfizer 5.3.6 Cumulative Analysis of Post- Authorization Adverse Event Report

Exhibit-12- Loiacono v. The Board Of Education Of City Sch. Dist. Of City of New York

Exhibit-13-750+ Studies About the Dangers of the COVID-19

## Affidavit of Truth and Facts, 07/13/2022 RECONSIDERATION NOTICE
### FROM: Shartisha Williams, and, Shartisha@gmail.com here and after "Affiant"

Affiant verifies that the information affiant is submitting in support of affiant's Religious Exemption Denial and Reconsideration and Accountability matter with supporting documents is now complete and accurate to the best of Affiant's knowledge.

X _Shatl Vill_ JULY 13th 2022

"Affiant" **Shartisha Williams**, LAST FOUR OF SS # 4450
13152 233RD ST RSOEDALE NY 11422

Sworn to and subscribed
before me this
16 day of July 20 22

Sharlie Hawkins
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01HA6415742
Qualified in NASSAU County
Commission Expires 03/29/2035

© undersigned 2022 **Shartisha Williams**, and, Shartisha@gmail.com
Certified true copy of the Original by the document custodian



NEW YORK CITY DEPARTMENT OF
HEALTH AND MENTAL HYGIENE
Dave A. Chokshi, MD, MSc
*Commissioner*

## ORDER OF THE COMMISSIONER OF HEALTH AND MENTAL HYGIENE OF THE CITY OF NEW YORK FOR THE COVID-19 NYC TEST AND TRACE CORPS PROGRAM

**TO:** Individuals who have been identified as cases or suspected cases of COVID-19, and individuals who have been identified as contacts of cases or suspected cases of COVID-19

**WHEREAS,** the Governor, the Mayor and the Commissioner of Health and Mental Hygiene have declared emergencies in response to the threat posed by COVID-19, and such emergencies continue; and

**WHEREAS,** on October 31, 2020, the Governor issued Executive Order No. 205.2 requiring all travelers entering New York from anywhere other than Connecticut, Massachusetts, New Jersey, Pennsylvania or Vermont to quarantine for a period up to 14 days, in order to protect New York from community transmission of COVID-19; and

**WHEREAS,** the COVID-19 NYC Test and Trace Corps Program identifies individuals who are cases, suspected cases, and contacts of cases or suspected cases, as defined in section 11.01 of the New York City Health Code (the "Health Code"), and advises them of the need to quarantine or isolate themselves to prevent further spread of COVID-19, and offers them medical and supportive services (the "Test and Trace Program"); and

**WHEREAS,** section 556 of the New York City Charter (the "Charter") and section 3.01 of the Health Code authorize the Department of Health and Mental Hygiene (the "Department") to supervise the control of communicable diseases and conditions hazardous to life and health and take such actions as may be necessary to assure the maintenance of the protection of public health; and

**WHEREAS,** section 11.23 of the Health Code authorizes the Department to take appropriate steps when a case, contact, or carrier of a contagious disease, or a suspected case, contact or carrier of a contagious disease may, in the opinion of the Commissioner of Health and Mental Hygiene, pose an imminent threat to the public health resulting in severe morbidity or high mortality;

**NOW, THEREFORE,** I hereby order that:

1. The Test and Trace Program shall continue to contact individuals who have been identified as cases or suspected cases of COVID-19, or as contacts of cases or suspected cases of COVID-19, or as having traveled from a location that requires they quarantine in New York City ("Contacted Individuals") to provide them with information about the need to quarantine or isolate in accordance with guidance from the Department and the State Department of Health.

2. Contacted Individuals who are required to quarantine or isolate should remain in quarantine or isolation for the time specified by the Test and Trace Program.

3. During Contacted Individuals' period of isolation or quarantine they shall communicate with the Test and Trace Program to determine whether they are remaining in quarantine or isolation or are in need of any services.

Contacted Individuals may at any time apply to request release from this Order. Please email the Office of the General Counsel, New York City Department of Health and Mental Hygiene, 42-09 28th Street, Long Island City, NY 11101-4132; OGC@health.nyc.gov. Requests made outside of business hours will be considered as soon as possible.

This Order takes effect immediately and shall remain in effect until the end of the public health emergency, or such earlier time as indicated by the Commissioner of Health and Mental Hygiene.

Dated: _____11/23/20_____

_____
Dave A. Chokshi MD, MSc
Commissioner


Health

# COVID-19: Understanding Quarantine and Isolation

| | Quarantine | Isolation |
|---|---|---|
| What does it mean? | Staying home, monitoring your health and separating from others after being recently in close contact with someone who has COVID-19. | Staying home, monitoring your health and separating from others when you have COVID-19 or COVID-19 symptoms. |
| Who needs to do this? | People who were in close contact with someone who has COVID-19 and either:<br>• Are not up to date on their COVID-19 vaccines<br>• Have not had COVID-19 in the last 90 days<br>Everyone else does not need to quarantine but should get tested, wear a face mask and follow other precautions. | People who test positive for COVID-19 or have COVID-19 symptoms, even if they are vaccinated. |
| Why should I do this? | If you are near someone with COVID-19, you are more likely to get it. Staying home prevents the spread to others. You can have and spread COVID-19 even if you do not have symptoms. | Staying home prevents the spread to others. You can spread COVID-19 even if you do not have symptoms. |
| Where should I stay? | At home or a free Take Care hotel.<br>Call 212-COVID19 (212-268-4319) or visit **www.nychealthandhospitals.org/take-care**. | At home or a free Take Care hotel.<br>Call 212-COVID19 (212-268-4319) or visit **www.nychealthandhospitals.org/take-care**. |
| How long do I need to do this? | At least five days after your last close contact with the person who has COVID-19. Wear a mask around others and follow key prevention measures for 10 days after your last close contact. | At least five days from when your symptoms began (or if you had no symptoms, your test date). If your symptoms do not improve or you have had fever in the past 24 hours, keep isolating. Wear a mask around others and follow key prevention measures for 10 days after your symptoms began (or test date, if you had no symptoms). |
| Should I get tested for COVID-19? | Yes, you should get tested five days after your last close contact with someone who has COVID-19 or right after you develop symptoms. | If you have symptoms, get tested right away. Stay isolated while waiting for your test result. |
| Should I get medical care? | Take your temperature twice daily and monitor for other symptoms. Contact your health care provider if you develop symptoms. Go to a hospital or call **911** if you have trouble breathing or another medical emergency. | Take your temperature twice daily and monitor for other symptoms. Contact your health care provider to let them know you tested positive or have symptoms and discuss treatment options. Go to a hospital or call **911** if you have trouble breathing or another medical emergency. |
| How do I protect other household members? | Avoid being near them as much as possible. Wear a mask whenever not alone in a room. Clean and disinfect your home. | Avoid being near them as much as possible. Wear a mask whenever not alone in a room. Clean and disinfect your home often. |
| Can I go to work or school? | Some people can go to work or school (see below). | No. |
| Where am I allowed to go? | To get essential medical care (including testing) and basic needs, like groceries, if you have no other way to get them. | To get essential medical care (including testing) and basic needs, like groceries, if you have no other way to get them. |

## Quarantine

**What does it mean to be fully vaccinated and up to date?**
**Fully vaccinated** means it has been at least two weeks since your second dose of the Pfizer or Moderna vaccine or single-dose Johnson & Johnson vaccine. People who got a two-dose vaccine or combination of vaccines authorized by the World Health Organization are also fully vaccinated.

**Up to date** means you are fully vaccinated and have received additional doses and booster shots when eligible, including:
- Your two-dose (Pfizer or Moderna) or one-dose (Johnson & Johnson) primary vaccine
- A third dose if you have a weakened immune system (if eligible)
- A booster shot (if eligible)

For information on third dose and booster shot eligibility, see **on.nyc.gov/thirddose** and **on.nyc.gov/boosterfaq.**

**What is a close contact?**
Close contacts are people who have been within 6 feet of someone who has COVID-19, for 15 minutes or more over a 24-hour period. This can be from two days before the person with COVID-19's symptoms began (or if they have no symptoms, two days before they tested positive). Usually, everyone living with someone who has COVID-19 are close contacts. This definition may change in places like schools and health care facilities.

**Who does not need to quarantine, and what precautions should they take?**
You do not need to quarantine if you either:
- Are up to date with your vaccines
- Had COVID-19 in the last 90 days (as confirmed by a positive viral test)
    - 90 days is from when you first had COVID-19 symptoms or, if you had no symptoms, the date of your first positive test.

If you are a close contact who does not need to quarantine, follow these precautions:
- Monitor symptoms for 10 days after your last contact with the person who has COVID-19.
- Get tested five days after your last close contact or right after you develop COVID-19 symptoms. If you had COVID-19 in the last 90 days, you do not need to get tested unless you develop symptoms.
- Isolate right away if you develop symptoms or test positive.
- Wear a well-fitting mask around others for 10 days after your last close contact (including at home).
- For 10 days after your last close contact, avoid spending time:
    - With people who are immunocompromised, are age 65 and older, or have a medical condition that increases their risk for severe COVID-19
    - In nursing homes and other high-risk settings

2

## Who needs to quarantine, and for how long?

Close contacts who are not up to date with their vaccines must quarantine for at least five days from their last close contact with the person who has COVID-19.

You should get tested at least five days after your last close contact with the person who has COVID-19 or right away if you develop COVID-19 symptoms:

- If your test result is negative or you are unable to get tested, you can end quarantine after Day 5. Wear a well-fitting mask for 10 days after your last close contact and follow other precautions (see below).
- If your test result is positive, isolate.

Some people must quarantine for more than five days:

- Children age 2 and under and others who cannot wear a well-fitting mask must quarantine for 10 days.
- Some high-risk settings, such as nursing homes, may have different quarantine requirements.

The day after your last close contact with someone who has COVID-19 is Day 1 of quarantine. For example, if your last close contact was on January 1 and you quarantine for five days, your last day of quarantine is January 6 and you can end quarantine on January 7.

## What prevention measures should I follow during quarantine and after quarantine ends?

For 10 days after your last close contact with someone who has COVID-19, even if you end quarantine sooner, you should:

- Monitor for COVID-19 symptoms and get tested and isolate if symptoms develop.
- Wear a well-fitting mask around others. Avoid spending time with people who are immunocompromised, are age 65 and older, or have a medical condition that increases their risk for severe COVID-19.
- Avoid high-risk settings and places where a mask cannot always be worn.
- Avoid crowds and nonessential activities.
- Avoid eating around others at home, at work and in a restaurant.
- Avoid travel. If you must travel, you should:
    - **Not** do so during your five-day quarantine period
    - **Not** do so until 10 days after your last close contact if you cannot get tested
    - Get tested at least five days after your last close contact, receive a negative test result and have no symptoms for all five days of quarantine before doing so
    - Wear a well-fitting mask around others for the entire 10 days. Anyone unable to wear a mask should not travel during the 10 days.

## Who can go to school while in quarantine?

Many schools, including all NYC Department of Education kindergarten to grade 12 schools, allow children to attend in person during quarantine if testing and other requirements are met. Check with your child's school about their requirements. Children must quarantine when not in school.

## Who can go to work while in quarantine?

Some teachers, school staff and City workers can work during quarantine if they are fully vaccinated as well as some health care workers. Check with your employer if you think this applies to you. People allowed to attend work must continue to quarantine when not at work.

## What happens if I develop symptoms or test positive for COVID-19 after being in close contact with someone who has COVID-19?

If you develop symptoms within 10 days of being in close contact with someone who has COVID-19, get tested and isolate while you wait for your result. If you test negative and are in quarantine, you must still complete quarantine. If you test positive, you must isolate. If testing is not possible, isolate for five days after your symptoms begin and wear a well-fitting mask around others for 10 days.

## Who must quarantine due to travel?

Quarantine after travel is recommended for people who are not vaccinated and required for some people visiting from outside the U.S. For more information, visit **cdc.gov/covid19travel**.

## Someone in my household must quarantine due to close contact with someone who has COVID-19 outside the home. Do I have to quarantine too?

No. Closely monitor for symptoms and take precautions to reduce your risk of getting COVID-19 if your household member has it. If the person in your household develops COVID-19, you will likely be a close contact and need to quarantine, unless you are up to date on your COVID-19 vaccines.

## Isolation

## Who needs to isolate, and for how long?

Everyone who tests positive for COVID-19 or has symptoms must isolate, whether vaccinated or boosted. If you:

- **Test positive**, you can end isolation after five days if you do not have symptoms or your symptoms improve, and have not had a fever in the past 24 hours without fever-reducing medicine. Otherwise, isolation should continue.
- **Have COVID-19 symptoms**, get tested right away and isolate while waiting for your result. If you test negative and are not in quarantine due to a recent close contact, you can end isolation if you have not had a fever in the past 24 hours without fever-reducing medicine. If you test negative and are in quarantine, you must finish your quarantine. If testing is not possible, isolate for five days after your symptoms begin.

Some people must isolate longer than five days:

- All children under age 2 and others who cannot wear a well-fitting mask for any reason must isolate for 10 days.
- People who have a medical condition, take medicine that weakens their immune system or are hospitalized for severe COVID-19 may need to isolate for more than five days and should speak with their provider.
- Some high-risk settings, such as nursing homes, may have longer isolation requirements.

**Everyone should wear a well-fitting mask around others and follow key prevention measures for 10 days (see below).**

The day after your symptoms begin (or if no symptoms, your test date) is Day 1 of isolation. For example, if your symptoms began on January 1 and you must isolate for five days, your last day of isolation is January 6 and you can end isolation on January 7. If you have no symptoms and were tested on January 1, you can end isolation on January 7. If you first develop symptoms after testing positive, the five-day isolation period should start over.

**What precautions should I take during isolation and after isolation ends?**
If you test positive for COVID-19, tell anyone you have been in close contact with from two days before your symptoms began (or if you had no symptoms, your test date) until you begin isolation. If you were at work, tell your employer. If your child tests positive and was in school, tell their school.

For 10 days after your symptoms begin (or if you have no symptoms, your test date), even if you end isolation sooner, you should:

- Wear a well-fitting mask around others (including at home).
- Take steps at home to avoid exposing others.
- Avoid spending time with people who are immunocompromised, are age 65 and older, or have a medical condition that increases their risk for severe COVID-19.
- Avoid high-risk settings and places where a mask cannot always be worn.
- Avoid crowds and nonessential activities.
- Avoid eating around others at home, at work and in a restaurant.
- Avoid travel. If you must travel, you should:
    - **Not** do so during your five-day isolation period
    - Avoid doing so until 10 days your symptoms began (or if you had no symptoms, your test date) after isolation ends
    - Wear a well-fitting mask around others for the entire 10 days. Anyone unable to wear a mask should not travel during the 10 days.

**Do I need to get tested for COVID-19 to end isolation?**
No. If you want to get tested, you should get a rapid antigen test toward the end of your five-day isolation period. If you test positive, keep isolating until Day 10. If you test negative, you can end isolation but keep wearing a mask and following other precautions for 10 days.

**How to Protect Yourself and Others**

**How do I monitor my health?**
Take your temperature twice daily. Check for symptoms, such as shortness of breath, cough, and loss of taste of smell or taste. If you have a fingertip oxygen meter (pulse oximeter), you can monitor your blood oxygen level (for instructions, visit **on.nyc.gov/covid-oxygen**).

Call your provider if you develop COVID-19 symptoms or your symptoms worsen. For medical emergencies, call **911** or go to a nearby hospital.

**How can I protect others in my household during and after quarantine or isolation?**

For 10 days after being in close contact with someone who has COVID-19 or after your symptoms started (or test date, if you have no symptoms), you should:

- **Create physical distance**: Stay in a separate room and use a separate bathroom, if possible. Keep away from others, especially people at increased risk for severe COVID-19 illness.
- **Cover up**: Wear a well-fitting mask when around others. Have them wear a mask around you. Cover your cough or sneeze with a tissue or your arm.
- **Clean**: Wash your hands often with soap and water. Clean surfaces you touch often. Do not share towels, food or utensils.
- **Ventilate**: Open windows and doors. Use a portable air cleaner. Turn on bathroom and stovetop fans that pull air upward.

For resources to help isolate at home or a free hotel room, call 212-COVID19 (212-268-4319) or visit **www.nychealthandhospitals.org/take-care**.

**What mask should I wear after a close contact, testing positive for COVID-19 or having symptoms?**

Make sure your mask always snugly covers your nose and mouth. Consider wearing a higher-grade mask, such as an N95 or KN95, if you can. You can also wear a cloth mask over a disposable mask. For more information about masks, visit **on.nyc.gov/face-masks**.

**What if I do not have a health care provider or health insurance?**

NYC Health + Hospitals offers care, regardless of immigration status or ability to pay. Visit **nychealthandhospitals.org** or call 212-268-4319. If you have COVID-19, NYC Health + Hospitals can help connect you to treatment.

**Additional Resources:**

- For information on COVID-19, visit **nyc.gov/health/coronavirus**.
- For information on COVID-19 vaccination, visit **nyc.gov/covidvaccine**.
- For information on COVID-19 treatment, visit **nyc.gov/health/covidtreatments**.
- For information on COVID-19 testing, visit **nyc.gov/health/testingtips.** To find a COVID-19 testing site, visit **nyc.gov/covidtest**. Many sites offer free testing.
- For information on paid sick leave during quarantine or isolation, visit **nyc.gov/health/covidtreatments** and **paidfamilyleave.ny.gov/covid19**.
- If you have questions, call **311** or 212-268-4319.

**The NYC Health Department may change recommendations as the situation evolves.**                    1.22.22



THE CITY OF NEW YORK
DEPARTMENT OF CORRECTION

# DIRECTIVE



| [X ] NEW | [ ] INTERIM* | [ ] REVISED | SUBJECT | | |
|---|---|---|---|---|---|
| EFFECTIVE DATE **2/10/92** | | *TERMINATION DATE | **EQUAL EMPLOYMENT OPPORTUNITY OFFICE** | | |

| CLASSIFICATION # 2221 | SUPERSEDES | DATED | DISTRIBUTION A | PAGE 1 OF 6 PAGES |
|---|---|---|---|---|
| RECOMMENDED FOR APPROVAL BY REVIEW BOARD MEMBER | | SIGNATURE | AUTHORIZED BY THE COMMISSIONER | SIGNATURE |

## I.   PURPOSE

The purpose of this Directive is to define the role of the Department's Equal Employment Opportunity Office (hereinafter referred to as E.E.O. or E.E.O. Office) and to establish policy and procedure governing the internal functioning of the Department's E.E.O. Office. Furthermore, purpose is to ensure the processing and resolution of all employee complaints of discrimination under Title VII, of the Civil Rights Act, as well as State and City Laws, promptly and fairly.

## II.   POLICY

A.   Employment discrimination, which includes sexual harassment as a form of sex discrimination, is a violation of Federal, State, and City anti-discrimination statutes, and is also a violation of both this Department's Equal Employment Opportunity Policy Statement (see attached Exhibit "A") and this Directive. Employees of this Department who are found by the Departments' E.E.O. Office to have engaged in acts which constitute employment discrimination shall be counseled and/or disciplined accordingly.   The Director of Equal Employment Opportunity may in certain circumstances, seek corrective action to rectify past or current discrimination.

B.   Retaliation
It is unlawful to retaliate against and/or harass any person for filing an Equal Employment Opportunity Complaint or for cooperating in the investigation of an Equal Employment Opportunity Complaint.   Any employee found to have engaged in such conduct shall be disciplined.

## EQUAL EMPLOYMENT OPPORTUNITY
## POLICY STATEMENT

The Department of Correction is an Equal Employment Opportunity Employer. As Commissioner, I reaffirm the Department's strong commitment to maintaining fair employment practices for all of its members.

Employment decisions in the Department will be made on the basis of merit, fitness and equality of opportunity and without unlawful discrimination[1] on the basis of:

| | |
|---|---|
| Age | . Marital Status |
| Alienage | . National Origin |
| Color | . Prior record of arrest or conviction |
| Creed | . Race |
| Disability | . Religion |
| Gender | . Sexual Orientation |

The laws prohibit discrimination which affects:

| | |
|---|---|
| . Recruitment | . Testing |
| . Hiring | . Training |
| . Assignments | . Transfers |
| . Working Conditions | . Discipline |
| . Salary and Benefits | . Termination |
| . Evaluations | Any other terms |
| . Promotions | and conditions |
| | of employment |

The law requires that reasonable accommodations be made for employees with disabilities.  The law also requires that reasonable accommodations be made for employees' religious observances.

All employees are directed to comply with both the letter and the spirit of these laws. All personnel should work to maintain an atmosphere appreciative of the diversity

---

[1] The term "unlawful discrimination" implies that some discrimination is legal. For example, employment discrimination is legal where denial of employment rights to persons within protected classifications is permitted by law, such as where an employer may deny employment on the basis of an applicant's prior record of arrest or conviction if there is a direct relationship between one or more of the applicant's criminal offenses and the specific employment sought, or where employing the applicant poses an unreasonable risk to property or to the safety or welfare of specific individuals or the general public. (See Corrections Law, Art. 23-A, Section 752.)



**Citywide Administrative Services**

Lisette Camilo
Commissioner

## Updated Guidance for City Agencies on Leave Policy Applicable During the Outbreak of Coronavirus Disease 2019 (COVID-19), eff. April 1, 2021

This document sets forth City leave policy with respect to City employees to mitigate the risk of the spread of Coronavirus Disease 2019 (COVID-19). This Guidance provides leave consistent with the emergency leave provided by Divisions C and E of the Families First Coronavirus Response Act ("FFCRA"), Pub. L. 116-127 and the America Rescue Plan (ARP).[1] It is effective April 1, 2021 and until further notice, and supersedes the January 12, 2021 guidance.

### I.   Definition

A. "Symptoms of COVID-19" means the following physical symptoms:

- Fever of 100.0 F or greater or chills
- Cough
- Shortness of breath or difficulty breathing
- Fatigue
- Muscle or body aches
- Headache
- Loss of taste or smell
- Sore throat
- Congestion or runny nose
- Nausea or vomiting
- Diarrhea

B. "Two workweeks" means the number of hours that an employee is regularly scheduled to work in a two-week period. Examples: for an employee whose regular schedule is 40 hours per week, two workweeks is 80 hours; for an employee whose regular schedule is 35 hours per week, two workweeks is 70 hours.

C. "COVID-19 diagnostic test" means either a molecular test, such as a Polymerase Chain Reaction (PCR) test, or a rapid antigen test.

D. "Close contact" means someone who was within six feet of an infected person, for at least 10 minutes over a 24-hour period, starting from two days before illness onset (or, for an asymptomatic person, two days prior to test specimen collection) until the time the person is isolated.[2]

---

[1] Division C of the FFCRA is entitled the "Emergency Family and Medical Leave Expansion Act." Division E of the FFCRA is entitled the "Emergency Paid Sick Leave Act."

[2] See https://www1.nyc.gov/assets/doh/downloads/pdf/covid/covid-19-understanding-quarantine-and-isolation.pdf.

## II. Determination of Personnel Performing Essential and Non-Essential Services during the Outbreak

A. Essential services are defined as follows in the order of importance:

1. Responding to the COVID-19 Emergency

Delivery of any service or function that is critical to the mitigation of the spread of COVID-19 and emergencies arising because of the outbreak or actions taken to mitigate the outbreak.

2. Lifesaving

The direct, in-person delivery of lifesaving services to the public.
Examples: Emergency medical services technicians and paramedics; 911 operators;

3. Life Protecting, Life Safety, Transportation, Utilities

Direct, in-person delivery of medical care to individuals in any capacity, control and care of incarcerated individuals or others under mandated or self-selected government custody of care of any interval, key personnel required to perform essential court proceedings that cannot be conducted remotely, removal / mitigation of environmental hazards, operation of mobility and transportation systems, and physical inspection or maintenance of properties and regulated public and private facilities to ensure continued public safety and public health and other maintenance, repair, and infrastructure to support lifesaving operations.

Examples: Public Health Nurse, Shelter Workers, Marine Engineer (Ferry); traffic enforcement agents

4. Workforce and Internal Service Continuity

Functions, systems, and support of critical equipment and networks that enable agency-specific and whole of government workforce productivity; revenue generation.

Examples: Information technology employees who maintain citywide and agency networks and communications, revenue operations, essential services contract administrators; city tax auditors; consumer affairs inspector

B. Non-essential services:

Agency-specific and whole of government roles, functions, and duties that are not critically essential to the continued performance of the above four categories.

Examples: records management, license processing, grant auditing

**III. General Policy Concerning Attendance of Employees in the Workplace During the Pandemic**

A. City employees must report to work at their assigned work sites as determined under the agency's written Restart/Safety Plan outlining how it will reduce the risk of spread of COVID-19 in the workplace developed in accordance with "Managing the Return to the Office in the Age of COVID-19," updated by DCAS on April 27, 2021.

B. An employee may not report to work other than telework in the following circumstances (the employee may be eligible for excused leave as outlined in Section (IV) with any additional leave charged to applicable leave balances):

1. The employee has exhibited symptoms of COVID-19

   An employee who has any documented symptom of COVID-19 must not report to work other than telework, until all of the conditions are met:

   a. They have no known exposure to COVID-19 through close contact (within six feet for at least 10 minutes over a 24-hour period) within the last 10 days and are not subject to a travel-related quarantine;
   b. They have not tested positive for COVID-19 using a COVID-19 diagnostic test within the past 10 days;
   c. They have received a negative result from a PCR (not a rapid antigen) test; **and**
   d. They have been fever-free for the last 24 hours without the use of a fever-reducer.

   **OR**

   a. It has been at least 10 days since their symptoms began;
   b. They have not had a fever for at least 24 hours without the use of a fever-reducer; **and**
   c. Other symptoms have improved.

2. The employee has tested positive for COVID-19

   An employee who has tested positive through a COVID-19 diagnostic test must not report to work other than telework, until all of the conditions are met:

   a. It has been at least 10 days since their symptoms began;
   b. They have not had a fever for at least 24 hours without the use of a fever-reducer; **and**
   c. Other symptoms have improved.

3. The employee has been in close contact with another person who had COVID-19

   An employee who in the past 10 days, has been in close contact with anyone while

3

they had COVID-19 may not report to work other than telework unless:

a. The employee has been fully vaccinated, and it has been two or more weeks following receipt of the second dose in a two-dose series or two or more weeks following receipt of one dose of a single-dose vaccine, **and**
b. The employee has remained asymptomatic since the last COVID-19 exposure.

**OR**

a. The employee has been previously diagnosed with laboratory confirmed COVID-19, has recovered from confirmed COVID-19,
b. It is within three months of the date of symptom onset from the initial infection or the date of the first positive diagnostic test, **and**
c. The employee has remained asymptomatic since the last COVID-19 exposure.

**OR**

a. The employee is an essential worker who is asymptomatic, **and**
b. The employee's human resources department has confirmed, in writing, that the employee's physical presence in the workplace is critical to operations or safety of the workplace and has provided the employee with requirements for returning to work after exposure.

4. The Employee developed a fever after receiving a vaccination for COVID-19

An employee who develops a fever within three days after receiving a vaccination for COVID-19 may not report to work other than telework unless:

a. The fever lasted less than 24 hours,
b. The employee has been fever-free for the last 24 hours (without using fever-reducing medication), **and**
c. The employee has not had any of the other COVID-19 symptoms listed above.

**OR**

a. The fever lasted less than 24 hours,
b. The employee has been fever-free for the last 24 hours (without using fever-reducing medication), **and**
c. The employee has received a lab-confirmed negative PCR (not rapid antigen) diagnostic test.

**OR**

a. It has been at least 10 days since their symptoms began;

     b.  They have not had a fever for at least 24 hours without the use of a fever-reducer; **and**

     c.  Any other symptoms have improved

5.  <u>The Employee developed other symptoms after receiving a vaccination that are consistent with vaccination</u>

An employee who develops other symptoms that are consistent with vaccination (fatigue, a headache, chills, muscle aches, joint pain, nausea or vomiting) within three days after receiving a vaccination for COVID-19 may not report to work other than telework until all of the conditions are met:

     a.  Employees whose symptoms last three or fewer days may return to work when they are feeling well enough to work.

     **OR**

     a.  Employees whose symptoms last more than three days may return to work after:

          1)  Testing negative for COVID-19 using a PCR test (not a rapid antigen test) with improving symptoms.

          **OR**

          1)  It has been at least 10 days since their symptoms began; and

          2)  All symptoms have improved.

6.  <u>The employee is subject to a governmental or a healthcare provider's quarantine or isolation order.</u>

## IV.  Leave Policy

### A. Excused Leave

1.  General Provisions

     a.  Excused leave at full pay under this Policy is immediately available to an employee who is unable to work or telework without regard to length of service.

     b.  Length of excused leave: Excused leave for an employee who tests positive with a COVID-19 diagnostic test shall be available until the employee is cleared to return to work, such excused leave is not to exceed four workweeks (20 workdays); provided that an employee who remains hospitalized or in a rehabilitation facility shall continue to receive excused leave until ten workdays

after the employee is released from the hospital or rehabilitation facility have passed.

c. Except as set forth in subparagraphs "b" of this paragraph, effective April 1, 2021, all excused leave provided pursuant to this guidance is limited to a cumulative total of two work weeks in each calendar year while this guidance remains in effect.

d. Part-time employees may receive excused leave for the number of bi-weekly hours that the employee was expected to work. Where expected hours cannot be readily determined, part-time employees may receive excused leave for the average number of bi-weekly hours that the employee worked over the six months preceding the leave.

e. Excused leave under this Policy is in addition to existing rules and entitlement regarding leave, e.g. annual leave and sick leave.

f. Agencies shall not require employees to charge absences to other accrued leave during the period of excused leave authorized by this policy.

g. An eligible employee may utilize excused leave intermittently as agreed upon by the agency and the employee. This leave must be taken in full-day increments if the employee is not teleworking. Excused leave may be taken in partial-day increments if the employee is teleworking and by agreement between the employee and the agency.

h. An employee may be required to submit medical documentation of the reason for sick leave if the absence is for more than three consecutive days.

i. After the first workday (or portion thereof) that an employee receives excused leave under this Policy, the agency may require the employee to follow reasonable notice procedures to continue receiving excused leave.

j. The City's and all Agencies' absence control procedures concerning lateness are suspended until further notice.

k. Employees who exhaust sick leave may be advanced additional sick leave at the discretion of the Agency Head. Until further notice, the provision of advanced sick leave does not require the employee to be a permanent employee or to have more than 10 years of service.

l. In the rare circumstance where an employee designated as currently performing non-essential services is unable to work remotely because of inadequate equipment or lack of assignment, the employee shall be granted excused leave with pay without charge to leave accruals.

2. Excused Leave at Full Pay for Exposure to or Diagnosis or Symptoms of COVID-19

An employee is eligible for excused leave at full pay as follows:

    a.  An employee is eligible for excused leave at full pay for a maximum of four workweeks with a documented positive COVID-19 diagnostic test; except that an employee who is hospitalized or in a rehabilitation facility shall continue to receive excused leave during such care and for ten workdays after the employee is released from the hospital or rehabilitation facility.

    b.  An employee is eligible for excused leave at full pay for up to two workweeks, with any additional leave charged to applicable leave balances as follows:

        i.  The employee is exhibiting symptoms of COVID-19 but does not, at the time symptoms develop, have a positive COVID-19 diagnostic test. To be eligible for excused leave, an employee must provide documentation that they have exhibited symptoms of COVID-19 and that they sought diagnosis of COVID-19 with a COVID-19 diagnostic test within three days from symptom onset. Employees must use their own sick leave for any additional time taken after receiving a negative COVID-19 test result or if they do not seek COVID-19 testing. **Please note, if the employee has a negative rapid antigen test, advise them they will need to confirm this negative result with a PCR test that is also negative before they can return to work**.

        ii.  The employee is subject to a governmental quarantine or isolation order or healthcare provider's quarantine order and is unable to telework while observing the quarantine or isolation order.

        iii.  The employee has been exposed to COVID-19 and is seeking or awaiting the results of a diagnostic test for COVID-19. The employee must obtain documentation of the exposure, or have been advised by a City agency responsible for testing and tracing or their own agency that they have been in close contact with someone who has tested positive and has to quarantine. Please note that employees who have had close contact exposure and have to quarantine as a result of that exposure cannot test out of quarantine early. They must complete the full quarantine regardless if they obtain a negative result from a PCR test before their quarantine period is complete.

3.  Excused Leave at Partial Pay. Employees are eligible for twelve workweeks of excused leave at partial pay (two-thirds of the employee's regular rate of pay, not to exceed $200 per day or a total of $12,000), as follows:

    a.  The employee is exhibiting symptoms of COVID-19 but does not, at the time symptoms develop, have a positive COVID-19 diagnostic test. To be eligible for excused leave, an employee must provide documentation that they have exhibited symptoms of COVID-19 and that they sought diagnosis of COVID-19 with a COVID-19 diagnostic test within three days from symptom onset.

Employees must use their own sick leave for any additional time taken after receiving a negative COVID-19 test result or if they do not seek COVID-19 testing. **Please note, if the employee has a negative rapid antigen test, advise them they will need to confirm this negative result with a PCR test that is also negative before they can return to work.**

b. The employee is subject to a governmental quarantine or isolation order or healthcare provider's quarantine order and is unable to telework while observing the quarantine or isolation order.

c. The employee is caring for an individual subject to a governmental quarantine or isolation order and the employee must demonstrate that the individual depends on the employee for care and that they are unable to telework while caring for an individual under the governmental quarantine or isolation order.

d. The employee is caring for an individual who has been advised by a licensed health care provider to self-quarantine either because of exposure to COVID-19 or because of heightened risk associated with exposure to COVID-19. The employee must provide documentation of the licensed health care provider's advice and must demonstrate that the individual depends on the employee for care and that they are unable to telework while caring for an individual in self-quarantine.

e. The employee is caring for a son or daughter under the age of 18 years whose school or place of care has been closed or whose child care provider is unavailable due to COVID-19 precautions. For childcare leave, the employee must provide documentation containing the following information:

    i.    Employee's name;

    ii.    Date(s) for which leave is requested;

    iii.    Qualifying reason for the leave;

    iv.    Oral or written statement that the employee is unable to work because of the qualified reason for leave (in this case care for a child);

    v.    The name and age of son or daughter being cared for;

    vi.    The name of the school, place of care or childcare provider that has closed or become unavailable;

    vii.    A communication from the school that provides the remote/hybrid learning schedules for the child; and

viii.   A representation that no other suitable person will be caring for the child during the period of the leave.

g.  An employee may waive excused leave at partial (two-thirds) pay authorized by this policy and use accrued annual leave or sick leave, if applicable, during the period of excused leave at partial pay.

h.  Such leave is available only to employees who have been employed for thirty (30) days or longer.

i.  An eligible employee may utilize leave at partial pay intermittently as agreed upon by the agency and the employee. This leave must be taken in full-day increments if the employee is not teleworking. Excused leave may be taken in partial-day increments if the employee is teleworking by agreement between the employee and the agency.

j.  Effective April 1, 2021, employees are eligible for a cumulative total of to 12 weeks of leave at partial pay in a rolling 12-months period, starting from the first day of leave.  The maximum 12 weeks of leave in a twelve-month period available under this section is reduced by the amount of FMLA leave taken by the employee during the same twelve-month period.

## B. Leave for Vaccine Reactions

1. Employees who exhibit a cough, shortness of breath, runny nose, congestion, sore throat or loss of taste must follow the existing COVID-19 leave policy outlined above.

2. Employees who exhibit any other symptoms that are consistent with vaccine side effects (fever, headache, chills, muscle aches, joint pain, nausea or vomiting) are eligible for excused leave as follows if symptoms develop within three days after receiving the vaccine:

### 1. Fever

a.  Employees who exhibit a <u>fever lasting less than 24 hours</u> after receiving the vaccine are eligible for excused leave at full pay for up to two workdays.

b.  Employees who exhibit a <u>fever lasting more than 24 hours</u> after receiving the vaccine are eligible for excused leave for up to two workweeks.

c.  To be eligible for excused leave at full pay, employees who stay out of work for more than three consecutive days must provide documentation showing they sought a COVID-19 diagnostic test during their leave and the date they received their test results. Employees must use their own sick leave for any additional time taken after receiving a negative test result or if they do not seek diagnostic testing.

9

2. **Fatigue, a headache, chills, muscle aches, joint pain, nausea or vomiting**

   a. Employees who exhibit fatigue, a headache, chills, muscle aches, joint pain nausea or vomiting (and no fever) after receiving the vaccine and are not feeling well enough to work are eligible for excused leave at full pay for up to two workweeks.

   b. To be eligible for excused leave at full pay, employees who stay out of work for more than three days must provide documentation showing they sought a COVID-19 diagnostic test during their leave and the date they received their test results. Employees must use their own sick leave for any additional time taken after receiving a negative test result or if they do not seek diagnostic testing.

3. **Other side effects**

   a. Employees who exhibit other symptoms that are consistent with vaccine side effects are eligible for excused leave at full pay for up to two workdays. Employees must use their own sick leave for any additional time taken.

 Gmail                                                                    Tisha Williams <shartisha@gmail.com>

## FW: Religious Exemption Decision
6 messages

**Williams, Shartisha (williams14)** <Shartisha.Williams@nychhc.org>                    Fri, Sep 24, 2021 at 1:16 PM
To: "shartisha@gmail.com" <shartisha@gmail.com>

**From:** COVID Vaccine Accommodation
**Sent:** Friday, September 24, 2021 12:29 PM
**To:** Williams, Shartisha (williams14) <Shartisha.Williams@nychhc.org>
**Cc:** Zemsky-Czizik, Karen <zemskyk@nychhc.org>; Akhrina, Anna <akhrinaa@nychhc.org>; Dumlao, Teresita
<dumlaot@nychhc.org>; HRSS Leave Administration <HRSSLeaveAdministration@nychhc.org>; COVID Vaccine
Accommodation <COVIDVaccineAccommodation@nychhc.org>
**Subject:** Religious Exemption Decision

Dear Shartisha Williams,

On or about September 14, 2021, you submitted to the Office of Equal Employment Opportunity (EEO) a
completed COVID-19 vaccination exemption form requesting exemption from the COVID-19 vaccine due to your religious
beliefs. This Office has received and reviewed your request for exemption and a reasonable accommodation from the
COVID-19 vaccine mandate.

The System has determined that the presence of unvaccinated staff at System work locations poses an undue
burden and a direct threat to System staff and patients. As such, your request for a reasonable accommodation was
reviewed to determine whether an alternative reasonable accommodation is available. After a review of your job duties
this Office has determined that there are no reasonable accommodations available which would permit you to perform
your essential job functions.

As such, this Office has approved a leave of absence **without pay** for a period of **sixty (60)** days, from
**September 27, 2021** through **November 26, 2021**. Prior to the expiration of this approved leave of absence this Office
will review your request to determine whether additional leave can be granted or if the Operational needs of your
department have changed such that the grant of additional leave poses an undue burden on the System.

Please contact Human Resources if you have any questions concerning timekeeping during this period.

Sincerely,

The Office of EEO

 Gmail

Tisha Williams <shartisha@gmail.com>

---

**Religious Exemption Decision**
2 messages

Tisha Williams <shartisha@gmail.com>                                                                 Mon, Oct 4, 2021 at 9:09 AM
To: Karen <zemskyk@nychhc.org>, Anna <akhrinaa@nychhc.org>, Teresita <durnlaot@nychhc.org>, HRSS Leave
Administration <HRSSLeaveAdministration@nychhc.org>, COVID Vaccine Accommodation
<COVIDVaccineAccommodation@nychhc.org>
Cc: zhous5@nychhc.org

To whom it may concern:

I am requesting that you review and reconsider your decision placing me on unpaid leave and providing the same
arrangements that I have been given at the start of this unforeseen event. For the last 18 months I have successfully and
competently done my job remotely from my home.  I was put on unpaid leave as a fully remote employee with my
approved exception as of September 27, 2021.

My job functions, which is essentially a biller, do not require me to work around vaccinated staff or patients and therefore
it is not an undue hardship for health and hospital or my fellow coworkers.

The unpaid leave is not the lack of reasonable accommodations available which would permit me to perform my essential
job functions. The unpaid leave is decided discrimination.

Thanks for your time and consideration.

Shartisha Williams

---

                                                                                                      Mon. Oct 4, 2021 at 9:11 AM

 Gmail

Tisha Williams <shartisha@gmail.com>

## NYC Health + Hospitals Notice to Employee on EEO Accommodation
5 messages

**HR Information** <HRInformation@nychhc.org>
Reply-To: HR Information <HRInformation@nychhc.org>

Fri, Oct 22, 2021 at 7:19 PM



October 22, 2021

According to our records, the System's Office of Equal Employment Opportunity ("OEEO") approved your request for a religious exemption from the COVID-19 vaccination requirement. As you were advised, prior to the expiration of your reasonable accommodation, the OEEO will review your accommodation to determine if an extension of your leave can be granted. No action will be taken in connection with your employment while you have an approved accommodation. However, we want to make you aware of the opportunity to voluntarily resign prior to the expiration of your reasonable accommodation with additional benefits as described below.

### Voluntarily Resign with Additional Benefits
Should you choose to resign prior to the expiration of your current reasonable accommodation, you may continue to receive health benefits through the end of this calendar year (or pick a separation date no later than December 31, 2021) **and** receive an additional lump sum payout of one work week of salary. To be eligible for these additional benefits, you would have to submit a release and waiver of claims against the System by **Friday, October 29, 2021**.

The following link: https://covid19.nychealthandhospitals.org/ElectronicAgreement

will redirect you to the Voluntary Release and Waiver for Unvaccinated employees. Please click here to electronically review the Voluntary Release and Waiver. If you electronically sign the form and submit it; an acknowledgement response will be electronically sent to you for your records.

A decision to participate in this opportunity to resign with additional benefits is strictly voluntary and will not have any effect on an evaluation of your reasonable accommodation request upon its expiration.

If you have any questions, or if you believe this communication has been sent to you in error, contact HRInformation@nychhc.org or call 646 694-6633.

Respectfully,

Yvette Villanueva

Senior Vice President, Human Resources



**Visit** www.nychealthandhospitals.org

**CONFIDENTIALITY NOTICE: The information in this E-Mail may be confidential and may be legally privileged. It is intended solely for the addressee(s). If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on this e-mail, is prohibited and may be unlawful. If you have received this E-Mail message in error, notify the sender by reply E-Mail and delete the message.**

---

**Tisha Williams** <shartisha@gmail.com>                       Wed, Oct 27, 2021 at 8:31 PM
To: HR Information <HRInformation@nychhc.org>
Cc: Karen <zemskyk@nychhc.org>, Anna <akhrinaa@nychhc.org>, Teresita <dumlaot@nychhc.org>, HRSS Leave Administration <HRSSLeaveAdministration@nychhc.org>, COVID Vaccine Accommodation <COVIDVaccineAccommodation@nychhc.org>, mmelo@cchr.nyc.gov

To whom it may concern:

Please be advised that OEEO has NOT approved my request for religious exemption from the COVID-19 vaccination requirement. I have requested an accommodation to continue working remotely as I have been successfully doing since march 2020. HHC has failed to engage in any cooperative dialogue with me regarding my accommodation request as required by the NYC human rights law. Unpaid leave is not a reasonable accommodation when other less restrictive accommodations are available. It would not be an undue burden for HHC to grant me an accommodation from the COVID-19 vaccine mandate and allow me to continue working remotely as I have been since March 2020. I have no intention of voluntarily resigning. In light of the above I am requesting reconsideration of my accommodation request.

Shartisha Williams

[Quoted text hidden]

---

**COVID Vaccine Accommodation** <COVIDVaccineAccommodation@nychhc.org>       Fri, Oct 29, 2021 at 10:54 AM
To: Tisha Williams <shartisha@gmail.com>, HR Information <HRInformation@nychhc.org>

Cc: "Zemsky-Czizik, Karen" <zemskyk@nychhc.org>, "Akhrina, Anna" <akhrinaa@nychhc.org>, "Dumlao, Teresita" <dumlaot@nychhc.org>, HRSS Leave Administration <HRSSLeaveAdministration@nychhc.org>, COVID Vaccine Accommodation <COVIDVaccineAccommodation@nychhc.org>, "mmelo@cchr.nyc.gov" <mmelo@cchr.nyc.gov>

Sent via email on 9/24/2021

Dear Shartisha Williams,

On or about September 14, 2021, you submitted to the Office of Equal Employment Opportunity (EEO) a completed COVID-19 vaccination exemption form requesting exemption from the COVID-19 vaccine due to your religious beliefs. This Office has received and reviewed your request for exemption and a reasonable accommodation from the COVID-19 vaccine mandate.

The System has determined that the presence of unvaccinated staff at System work locations poses an undue burden and a direct threat to System staff and patients. As such, your request for a reasonable accommodation was reviewed to determine whether an alternative reasonable accommodation is available. After a review of your job duties this Office has determined that there are no reasonable accommodations available which would permit you to perform your essential job functions.

As such, this Office has approved a leave of absence **without pay** for a period of **sixty (60)** days, from **September 27, 2021** through **November 26, 2021.** Prior to the expiration of this approved leave of absence this Office will review your request to determine whether additional leave can be granted or if the Operational needs of your department have changed such that the grant of additional leave poses an undue burden on the System.

Please contact Human Resources if you have any questions concerning timekeeping during this period.

Sincerely,

The Office of EEO

**From:** Tisha Williams <shartisha@gmail.com>
**Sent:** Wednesday, October 27, 2021 8:32 PM
**To:** HR Information <HRInformation@nychhc.org>
**Cc:** Zemsky-Czizik, Karen <zemskyk@nychhc.org>; Akhrina, Anna <akhrinaa@nychhc.org>; Dumlao, Teresita <dumlaot@nychhc.org>; HRSS Leave Administration <HRSSLeaveAdministration@nychhc.org>; COVID Vaccine Accommodation <COVIDVaccineAccommodation@nychhc.org>; mmelo@cchr.nyc.gov
**Subject:** Re: NYC Health + Hospitals Notice to Employee on EEO Accommodation

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe. Forward suspect email to spamadmin@nychhc.org as an attachment (Click the More button, then forward as attachment).

[Quoted text hidden]

**Tisha Williams** <shartisha@gmail.com>
To: Tisha Williams <shartisha@gmail.com>

Fri, Nov 12, 2021 at 12:31 PM

 **Gmail**

Tisha Williams <shartisha@gmail.com>

---

## Accommodation Expiration Notice
2 messages

**HR Information** <HRInformation@nychhc.org>　　　　　　　　　Tue, Nov 16, 2021 at 12:07 PM
Reply-To: HR Information <HRInformation@nychhc.org>
Cc: "Zemsky-Czizik, Karen" <zemskyk@nychhc.org>, "Velez, Gina" <Gina.Velez@nychhc.org>, "Akhrina, Anna"
<akhrinaa@nychhc.org>, "Sinclair, Christopher" <sinclaic3@nychhc.org>



Live Your Healthiest Life.　**NYC HEALTH+ HOSPITALS**

November 16, 2021

*The Office of EEO has advised us that your accommodation, an approved leave of absence, will
come to an end on Saturday, November 27, 2021. We want to outline what your options are
moving forward.*

### Option 1: Get Vaccinated

*Get vaccinated by Sunday, November 28, 2021 and you will be able to return to work
immediately after having received the first dose and provide proof of vaccination to OHS.:*

*Vaccines are free and widely available at NYC Health + Hospitals locations.*

*Employees who receive their vaccination at a NYC H+H site will be prioritized for vaccination
and proof of vaccination will be automatically uploaded to OHS. You can easily schedule your
vaccine via this online COVID-19 Vaccination Scheduler. (https://covid19.
nychealthandhospitals.org/covid19vaccinationscheduler/Account/SignIn) If you receive a
vaccine that requires a second dose you must receive that second dose no later than six weeks
after you received the first dose.*

### Option 2: Voluntarily Resign With Additional Benefits

*You may voluntarily resign __and__ continue to receive health benefits through the end of your
separation date (no later than December 31, 2021) and receive an additional lump sum payout
of one work week of pay. To be eligible for these additional benefits, you will have to submit a
release and waiver of claims against the System by **Sunday, November 28, 2021.***

*The following link: https://covid19.nychealthandhospitals.org/ElectronicAgreement*

*will redirect you to the Voluntary Release and Waiver for Unvaccinated Employees. Please click
here to electronically review the Voluntary Release and Waiver. If you electronically sign the
form and submit it, an acknowledgement response will be electronically sent to you.*

### Option 3: Administrative Separation

*If you do not choose either of the above options, you will be separated from NYC Health + Hospitals on **Monday, November 29, 2021.***

*If you have any questions, contact HRInformation@nychhc.org or call 646 694-6633.*

*Respectfully,*

*Yvette Villanueva*
*Senior Vice President, Human Resources*



Visit www.nychealthandhospitals.org

**CONFIDENTIALITY NOTICE: The information in this E-Mail may be confidential and may be legally privileged. It is intended solely for the addressee(s). If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on this e-mail, is prohibited and may be unlawful. If you have received this E-Mail message in error, notify the sender by reply E-Mail and delete the message.**

---

**Tisha Williams** <shartisha@gmail.com>
To: Printandgo@fedex.com

Wed, Nov 17, 2021 at 4:15 PM

[Quoted text hidden]

 **Primary**

 

RE: Accommodation Expiration Notice

 **HR Information**
to Zemsky-Czizik,, Velez,, Akhrina,, +1
Nov 22, 2021 Details

This message has been modified to fit your screen. Tap here to show original.

REMINDER



November 16, 2021

*The Office of EEO has advised us that your accommodation, an approved leave of absence, will come to an end on Saturday, November 27, 2021. We want to outline what your options are moving forward.*

**Option 1: Get Vaccinated**

*Get vaccinated by Sunday, November 28, 2021 and you will be able to return to work immediately after having received the first dose and provide proof of vaccination to OHS.:*

*Vaccines are free and widely available at NYC Health +*

Primary   

### Option 1: Get Vaccinated

*Get vaccinated by Sunday, November 28, 2021 and you will be able to return to work immediately after having received the first dose and provide proof of vaccination to OHS.:*

*Vaccines are free and widely available at NYC Health + Hospitals locations.*

*Employees who receive their vaccination at a NYC H+H site will be prioritized for vaccination and proof of vaccination will be automatically uploaded to OHS. You can easily schedule your vaccine via this online COVID-19 Vaccination Scheduler. (https://covid19.nychealthandhospitals.org/ covid19vaccinationscheduler/Account/SignIn) If you receive a vaccine that requires a second dose you must receive that second dose no later than six weeks after you received the first dose.*

### Option 2: Voluntarily Resign With Additional Benefits

*You may voluntarily resign __and__ continue to receive health*

*benefits through the end of your separation date (no later than December 31, 2021) and receive an additional lump sum payout of one work week of pay. To be eligible for these additional benefits, you will have to submit a release and waiver of claims against the System by* **Sunday, November 28, 2021**

**Primary**   

*The following link: https://covid19.nychealthandhospitals.org/
ElectronicAgreement*

*will redirect you to the Voluntary Release and Waiver for
Unvaccinated Employees. Please click here to electronically
review the Voluntary Release and Waiver.  If you
electronically sign the form and submit it, an
acknowledgement response will be electronically sent to you.*

**Option 3: Administrative Separation**

*If you do not choose either of the above options, you will be
separated from NYC Health + Hospitals on **Monday,
November 29, 2021.***

*If you have any questions, contact
HRInformation@nychhc.org or call 646 694-6633.*

*Respectfully,*

*Yvette Villanueva*

*Senior Vice President, Human Resources*

Offline.                                              Last checked: just now

'HRInf...

**unlawful. If you have received this E-Mail message in**

**Tisha Williams**
to HR
Nov 24, 2021 Details

To whom it may concern:

Enclosed please find a medical exemption from my healthcare doctor, Dr. Mittmen which states that I am allergic to some ingredients that are included in the covid-19 vaccination shot.    The ingredients that are in the vaccination  will affect my body's chemistry and be detrimental to my system. Please accept my exemption.

Respectfully,

Shartisha Williams

PDF  Medical Letter Shartisha...

**HR Information**
to COVID, me
Nov 26, 2021 Details

Forwarding for review



# Pathologist Speaks Out About COVID Jab Effects

Analysis by Dr. Joseph Mercola    July 03, 2022

## STORY AT-A-GLANCE

> In the wake of the COVID jab rollout and additional boosters, a number of health conditions are on the rise, including cancer, most notably cancers of the uterus, endometrial cancers, and very aggressive blood and brain cancers

> Cancer has been on the rise for decades, thanks to dietary factors, but the COVID jabs appear to dramatically accelerate the disease process. Many doctors report cancer patients with stable disease, and those who have been in remission for years, will suddenly and rapidly develop Stage 4 disease

> A military whistleblower has come forward with data from the Defense Medical Epidemiology Database (DMED) database showing dramatic increases in medical visits for cancers and other conditions, post-jab

> For neurological side effects of the shot, four remedies that can be very helpful are fluvoxamine (an antidepressant that blocks cytokine production in neural tissues), pharmaceutical grade methylene blue (improves mitochondrial respiration and repair), near-infrared light (triggers production of melatonin in your mitochondria) and hyperbaric oxygen therapy (boosts mitochondrial function, decreases inflammation and much more)

> The COVID jabs also downregulate toll-like receptors 7 and 8, which allows latent viruses such as herpes EBV4 — Epstein-Barr, aka, mononucleosis — to flourish that would otherwise have been kept in check

Dr. Ryan Cole, an anatomic clinical pathologist with a subspecialty in skin pathology and postgraduate Ph.D. training in immunology, has been on the frontlines exposing the

fraudulent COVID narrative.

Since 2004, he's been operating his own business, a pathology laboratory, which gives him rare freedom and flexibility to comment on what he's seeing. Most others would lose their jobs for speaking out the way Cole has.

## Truth Telling Is a Risky Business

That doesn't mean he hasn't paid a price for speaking out about and defending real science though. He's triple board certified and has 12 state licenses, and because of his stance against COVID recommendations, some of the credentialing organizations have taken action against him.

> "I've seen 500,000 patients diagnostically in my career through the microscope. So, I have a long track record of diagnostics. I have not had a patient care complaint against me in 26 years of being a physician," he says. "I still don't, and this is what's fascinating.

> Of those 12 licenses, four were under attack, three are still under attack — in Washington, Arizona and Minnesota — [yet there's] not a single patient care complaint. All the attacks against me have been political complaints to boards of medicine, which is not legal for them to do. Not a single one of those complaints is from a patient.

> And then — really the most egregious thing — was ex parte, without me being present, without even sending a certified letter, the College of American Pathologists removed my fellowship status, which is defamatory.

> I went back and found their complaint and looked at what they did, and I actually have a wonderful defamation lawsuit against them, because everything they did was anti-scientific. So, they can either restore [my fellowship] now, or just pay me a big check down the road. One or the other."

He's also lost about half of his business, as two insurance companies canceled him for "unprofessional behavior," i.e., for sharing and discussing the science of COVID, and one of his best friends, whom he's worked with for 12 years, canceled their business relationship as he didn't want Cole's outspokenness to affect his business. "All because of the defamation by the media, so to tell the truth in this day and age is a dangerous thing," he says.

## Suspicions Arose Early On

From his Ph.D. work in immunology, Cole was very aware of SARS-CoV-1 and MERS, having studied both, so when the warp speed program to develop a pandemic SARS-CoV-2 vaccine was announced, he became immediately suspicious.

> *"I thought, wait a minute, you can't vaccinate against corona viruses!" he says. "This family of viruses is not amenable to vaccination, based on mutation rates. So, my concern was very high, early on."*

Cole's lab ramped up PCR testing, using a cycle threshold (CT) of 35, rather than the recommended 40 to 45, as he knew that high a CT would result in 98% false positives. On a side note, pathologists not only assess tissue samples and biopsies, they're also in charge of testing. The head of every major clinical lab is a pathologist. They're basically in charge of quality control.

> *"As pathologist, we're constantly looking at patterns, be it under the microscope or be it in lab data. We're looking at blood reports. We're looking at what's out of range on blood reports. We're looking at microbiology. We're looking at molecular biology. We're looking at cultures. We're looking at pap smears. We're looking, across the board, at those clinical parameters in addition to tissue biopsies," he explains.*

> *"I have 70 employees, and if there's a blood smear that looks unusual, they bring it to me. If there are parameters on a test that look widely out of range, they bring it to me. And I call and talk to the clinician — [I'm the] doctor to the doctor.*

*We have a consultation practice with the clinicians so I can help them understand what's happening with their patient, and then they can make clinical decisions going forward."*

## Post-Jab Cancer Explosion

One of the apparent side effects of the COVID jab that Cole has been warning and talking about is cancer. He explains:

*"Obviously, during COVID, we saw some parameters change in blood tests. There was a concern about clotting. We saw elevated clotting factors. We know that the early variants were pretty severe in terms of inducing clotting, which was a shame because the whole world should have been simply using anti-inflammatories, steroids and anti-clotting agents, and so many more people would've lived.*

*My colleague, Dr. [Shankara] Chetty in South Africa, was having phenomenal success with antihistamine steroids and anti-clotting agents. So anyway, that first year, we saw drops in white blood cell counts, we saw decreases in certain subsets of T-cells. But when the shots rolled out, things changed.*

*At first I noticed kind of an innocuous little bump that we see usually in children. It's a little virus called molluscum contagiosum [that causes] a little white bump.*

*Usually, by the time you're a tween or early teen, you've built immunity to that and you never get them again, or rarely get them again. But after the shots rolled out, all of a sudden, in 80-year-olds, 70-year-olds, 60-year-olds, 50-year-olds, I started seeing literally a 20-fold increase in this little innocuous viral bump. And I thought, 'Uh oh, this means they've lost immune memory' ...*

*Those subsets of T-cells that keep viruses in check are very important for keeping cancer in check. And this is where immunology jumps into the picture. All of us have some atypical cells, and we have the 'Marines' of our immune*

system, our natural killer (NK) cells. They're on the frontline circulating. We have about 30 billion T-cells circulating in our blood, many of which are killer cells and NK cells.

Our other innate cells are our macrophages, monocytes and dendritic cells. They're on that frontline. They're shaking hands with every cell in your body all day long saying, 'Friend or foe? Friend or foe? Oh gosh, this one has some mutations, it's now a foe.' They'll poke a little hole in it, throw in a little enzyme called a grandzyme — a 'hand grenade' — blow up that cell, and we're good.

But what happened after these shots rolled out is that many of those cell subsets started decreasing in number. The first cancer I saw uptick was cancers of the uterus, endometrial cancers. Usually, I would see maybe two endometrial cancers a month. All of a sudden, a few months after the rollout of the shots, I was seeing two or three a week.

Another subspecialty area of focus for me is melanoma. And I started seeing melanomas, not only in younger patients, as the shots dropped down in age cohort, but they were thicker. The other fascinating thing was they're more aggressive in terms of how many dividing cells was present in each tumor. I'm still seeing this.

Beyond that ... I've been traveling the country and the world quite a bit ... and wherever I go now, I have doctors and nurses approach me saying, 'What you're saying, we've been seeing.'

I was having a conversation with a chair of a large oncology department in Tallahassee, and he said, 'I usually see an aggressive brain cancer in a young patient maybe every decade.' After the boosters rolled out, he saw five astrocytomas, five aggressive brain cancers, in one month.

Then, I'm in Jacksonville the next day, having a conversation with a family doctor. He said, 'Gosh, it's strange, I usually see a kidney cancer in a young patient every decade or so. I've seen five in the last month.'

*Then I was in the UK a couple weeks ago. I had a doctor from Ireland who's been a practicing family doc, GP, for 36 years, and he said, 'I have seen more cancer in my young patients ever since the shots rolled out, and the booster, than I have ever seen in my entire career.'*

*Same thing, a nurse that works emergency department in the UK, [said she's seen] not only the heart inflammation in young children, but cancers in young patients and aggressive leukemias. So everywhere I go, I have doctors confirming my observations ... I've had many of them approach me and say, 'Hey look, I'm seeing what you're saying, but I can't say it because I'll get fired.'"*

## Cancer Spike Is Being Covered Up

Aside from what Cole has seen in his own lab, a military whistleblower has also come forward with data from the Defense Medical Epidemiology Database (DMED) database showing dramatic increases in medical visits for cancer, neurological diseases, infertility, autoimmune diseases and several other conditions, post-jab.[1]

The DMED is one of the best databases in the world, as the Department of Defense keeps very close tabs on what's happening with our troops. This DMED data was presented during a hearing led by Sen. Ron Johnson. A week after that hearing, the DoD froze access to the DMED, and when it reopened a week later, the data were all changed to eliminate the data spikes.

*"That's what was really shocking," Cole says. "I think this is basically fraud to the level of Watergate, in terms of [there being] somebody behind the scenes, and then the private company that actually manages that database ... manipulated it."*

The DoD has tried to explain this suspicious activity claiming a "bug" in the system had resulted in underreporting of medical conditions in the five years prior to 2021. The number of cancers and other health problems were actually higher in 2015 through 2020 than initially indicated, they said.

However, how can a program error cause data corruption for five consecutive years and then self-correct, resulting in perfect numbers for 2021? And how did they not notice the error earlier? Again, this is one of the best-kept databases in the world. And how come this "bug" only affected conditions that also just so happen to be known and/or suspected side effects of the jab?

## Future Prognostication

Clearly, cancer has been on the rise for decades, thanks to dietary factors, but the COVID jabs appear to dramatically accelerate the disease process. There are no published studies to help us foretell the future, but based on what Cole has found so far, how long does he think it'll be before conditions like cancer spiral out of control?

> *"That's a great question," he says. "One of the important findings I've heard from many of these clinicians is that many of their patients who have been cancer-free for three, four, five years, their PET scan looks great, no detectable disease, and after that second or third shot, all of a sudden there's Stage 4 disease. It's like wildfire.*

> *And this goes back to immune suppressive mechanisms, the damage that the persistent spike protein and the persistent modified RNA (mRNA) cause. So, aggressive cancers arising very quickly are one thing we're seeing. Because it's a dose-dependent poisoning curve — in terms of the more spike you have circulating, the worse your immune system seems to be doing — the No. 1 thing is, don't get another shot.*

> *Because it is causing that immune suppression that's allowing those cancer mechanisms. Over time ... I would say we're going to see a consistent twofold to threefold increase in certain cancers, endometrial cancers, breast cancers, cancers of the prostate, cancers that are testicular or ovarian, neurologic cancers.*

*This spike protein has a propensity to cross the blood brain barrier and invade neural tissues. We know what it does to mitochondrial activity in terms of inhibiting it, blocking it, ruining cytochrome C oxidase systems, decreasing ATP.*

*Cancer is a hypoxic state. When you don't have good cellular activity and cellular respiration and hypo-oxygenation, you end up with mechanisms that can induce more aggressive cancer. So, I think, at a minimum, [there'll be a] two- to threefold [increase] ... over the next year or two.*

*We can only hope that the immune system can normalize and we come up with enough interventions and treatments that will reverse some of this, what some people call spikeopathy, or the different diseases that are being caused by this persistent spike. 'I don't know' is the honest answer, but that would be my projection based on I've seen."*

## Excess Mortality Has Dramatically Increased

Abnormal blood clotting is another commonly reported side effect of the jabs. Post-mortem investigations have revealed thick, extremely long rubbery clots, including in the arteries, which is rare. The longest Cole has seen was about two feet. We're also seeing a lot of micro-clotting, heart inflammation (myocarditis), strokes and heart attacks — all of which can have lethal consequences.

> **66 It's highly concerning that we have regulatory agencies allowing the most dangerous medical product ever released on humanity to persist in the marketplace. ~ Dr. Ryan Cole 99**

In early January 2022, OneAmerica, a national mutual life insurance company, announced[2] the death rate of working-age Americans (18 to 64), in the third quarter of 2021, was 40% higher than prepandemic levels. And this excess mortality was not due

to COVID infection. Many of those deaths were in fact cardiac deaths and strokes, which fits the injury profile of the COVID shots.

> "After they came forward, additional insurance companies said, 'We're seeing anywhere from 30% to 50% increase in claims as well.' They have no horse in the race. They're just observing. And I say that as a pathologist too. Look, I don't create disease. I don't prevent disease. I'm a reporter at the scene of the crash.

> My job is simply to report patterns, and then we can scientifically confirm those data patterns. And the all-cause death is increased in those who've gotten two, three shots. Again, it's a dose-dependent curve. The more spike your body is making, the worse people tend to do over time.

> Even Walgreens came out a couple weeks ago and showed their data. Individuals that got shots are getting COVID at higher rates. Even the mainstream media finally, last week — I think it was Good Morning America — said, 'It's looking like the boosters are a bad idea because it's immune suppressing people.'

> So, we're finally making some progress and getting traction in the mainstream where at least the narrative is cracking. There's a crack in the dam and it's starting to leak. Hopefully it'll rush forward and people will go, 'Whoa, this was a bad idea. Let's stop this chaos.' But the FDA is trying to roll it out on [infants] of all things now ... It's really tragic."

## Why Was the Most Toxic Part of the Virus Chosen?

Considering autopsies have shown spike protein is still present at least four months after their last shot, it seems reasonable to assume that severe health problems can arise months or even years down the road. In fact, we still don't know if the body ever stops producing spike protein once this genetically modified mRNA is injected.

> "We know the spike is the inflammatory aspect of the virus, and our cells are made into spike toxin factories," Cole says. "Studies out of the Salk Institute

*show that the spike is the cytotoxic aspect of [COVID-19], so we're giving a shot that makes the toxic part of the virus, and it's persisting.*

*That's why I think we're going to see this consistent elevation of different diseases related to the spike, be it cardiac, strokes, chronic clotting conditions, individuals dying from pulmonary emboli ... It's highly concerning that we have regulatory agencies allowing the most dangerous medical product ever released on humanity to persist in the marketplace."*

## Neurological and Vascular Chaos

As predicted by MIT researcher Stephanie Seneff, Ph.D., we're now also starting to see reports of Creutzfeldt-Jakob — human mad cow disease — which is a prion disease that basically destroys the brain.

Strokes in young people and children are also on the rise. Media are now trying to convince you that this is "normal," but it is anything but. Historically, children and teens do not die from strokes. This is a brand-new phenomenon, courtesy of the COVID jabs.

Microvascular clots (microvascular infarcts) are also a known contributing factor, in the long term, to early onset dementia. So, that's yet another potential health avalanche in the making.

## Four Helpful Remedies

I've quickly become a fan of pharmaceutical grade methylene blue, as it's been shown to improve mitochondrial respiration and aid in mitochondrial repair. At 15 to 20 milligrams a day, it could potentially go a long way toward resolving some of the fatigue many suffer post-jab and post-COVID. It may also be helpful in acute strokes. The primary contraindication is if you have a G6PD deficiency (a hereditary genetic condition), in which case you should not use methylene blue at all.

Another important remedy is near-infrared light. It triggers production of melatonin in your mitochondria[3] where you need it most. By mopping up reactive oxygen species, it too helps improve mitochondrial function and repair. Natural sunlight is 54.3% near-infrared radiation,[4] so this treatment is available for free.

For neurological side effects of the shot, a selective serotonin reuptake inhibitor (SSRI) antidepressant called fluvoxamine may be helpful. Cole explains the mechanism behind it:

> "[Fluvoxamine] upregulates a receptor called sigma-1, which blocks another receptor called inositol-requiring enzyme 1, which is a precursor for cytokines. So, fluvoxamine will block cytokine production in neural tissues. And that's why [it works]. It's not because of its antidepressant effects. It's a cytokine precursor blocker. So, you actually are decreasing a cytokine storm in neural tissues.

> This is why one uses fluvoxamine. There are other SSRIs, but this mechanism is very specific to fluvoxamine. It's a tough to tolerate drug for some people. It makes some people anxious and agitated, but if you can tolerate it for two weeks, you can really turn down those inflammatory pathways in many patients. I'm not going to say everybody, but I've seen it work in many patients."

A fourth treatment suggestion is hyperbaric oxygen therapy (HBOT). This too can be phenomenally helpful for strokes, heart attacks, autoimmune diseases and neurodegenerative disorders. To learn more, see "Hyperbaric Therapy — A Vastly Underused Treatment Modality."

## IMPORTANT: COVID Shots Are Not Pharmaceutical Grade

Seneff also warned about potential unknowns arising from fragmented mRNA and impurities, as tests have shown these jabs really are NOT pharmaceutical grade, as you'd expect. Cole comments:

> "These aren't pure products, and I think this is a very important point. When Pfizer submitted vials to the European Medicines Agency to look at purity ...

*they were in the 50% range ... The TGA in Australia looked at it and said, 'Look, these are only about 60% pure.'*

*This means you have a lot of fragmented sequences of mRNA that don't have a stop or a start code on. They're not coding for what you think they're coding for. They're coding for other tinier, shorter fragments. Are those mitogenic? Probably, but we don't know. Can those reverse transcribe into our own DNA? Studies out of Sweden ... show yes, they can ...*

*And then, when they manufacture, they can't spin and agitate these, so you get all these lipids that collect at the top of these big vats. So now you get some batches that are hyperconcentrated and some are hypoconcentrated. It appears about 5% of the batches are responsible for about 80% of the harms."*

## Autoimmune Diseases of All Kinds Are To Be Expected

As explained by Cole in the interview, there's a reason there's never been a successful mRNA gene therapy product brought to market, despite 20 years of research effort. The persistence of synthetic mRNA with pseudouridine always caused too many problems in the animal trials to move into human trials. It caused autoimmune disease. It caused mutations. The manufacturers don't even know if the nanolipid used to protect the mRNA is safe in humans.

*"Based on the animal trials, we know there were problems and we can only predict that that's going to happen in humanity. I want to be wrong, but from a basic immunology point of view, I don't think I am," Cole says.*

*"The nanolipid particles vary in size, interestingly. I've looked at some under the microscope. Some of them congeal and some of them stay tiny. But because of the fatty nature of them, they will carry their little mRNA and fractionated mRNA package to any cell in the body. And that's the biggest concern. Now it has turned any cell in your body to a potential target [for your immune system].*

*An important paper came out in the European Journal of Immunology just about a month ago by Dr. Hagemann. There's a condition called antibody dependent cellular cytotoxicity. What that means is that [the mRNA] sequence gets into your cell [and] that cell now becomes the spike factory.*

*That spike is on the surface of your cell. Now your NK cells that I talked about earlier say, 'We better blow that cell up.' So now, because there's that spike on the surface, your immune system will destroy your own cells. This is another one of the detrimental effects."*

## Pipeline Now Filled With Risky mRNA Shots

Making matters worse, even though the COVID shots have been shown to be a complete disaster, the drug industry is already working on dozens of different mRNA "vaccines," thinking they now have carte blanche to put out whatever they want using this platform.

And the reason for this continued insanity is because our health and regulatory authorities are corrupted to the core. They are completely dishonest. They're covering up the shocking harms, and unless something radically changes, they will allow dozens of equally dangerous mRNA gene transfer injections to be put out.

## Reactivation of Latent Viruses

The COVID jabs also downregulate pattern receptors in your body called toll-like receptors. Specifically, toll-like receptors 7 and 8 are downregulated by the mRNA and pseudouridine in these shots. What does that do? It allows latent viruses to flourish that would otherwise have been kept in check.

"We've seen a big uptick in herpes family viruses, especially herpes EBV4, which is Epstein-Barr virus [aka] mononucleosis," Cole says. So, for those with post-COVID or post-jab fatigue, long-COVID and those with MS-like symptoms, he recommends checking for Epstein-Barr.

About 80% of MS patients have high Epstein-Barr titers. "You will find that a lot of these individuals will have reactivated mono," he says. For reactivated mono, methylene blue, HBOT and nebulized peroxide would all be indicated.

## Fertility Under Attack

In the interview, Cole also reviews the potential impacts of the COVID jabs on the reproductive system. Menstrual dysregulation appears extremely common, as is the inability to become pregnant, despite trying for months, and spontaneous abortions are off the charts. The DMED database also showed a strong signal for fetal malformation before it was frozen and altered.

> "What we're doing to society and humanity with a previously never before used modality and product is causing horrendous harm to the human race, with no regard for science, with no regard for scientific integrity. It's a machine gone amuck," Cole says.

> "There are darker forces behind it. A lot of people are making billions, but they're killing people to do it. And it's just so unethical what we're experiencing societally. Yes, we're causing infertility. Yes, we're causing mutations in cancers. Yes, we're causing heart attacks and strokes. Yes, we're destroying the longevity of a younger generation. It is horrendous.

> There's no justification for any doctor who can look themselves in the mirror and say, 'I feel comfortable giving this experimental product to my patients all day long.' They need to reflect and realize they've lost their mind, [their] critical thinking skills."

## More Information

Sadly, almost everyone who's credible and trustworthy has been censored and deplatformed at this point, so finding them can be a challenge. To follow Cole's work, be

sure to bookmark his website, RColeMD.com. You can also find him on the
GlobalCovidSummit.org forum.

If you are vaccine injured, the Global COVID Summit has a blockchain-based forum
where you can share your experience and it will never be taken down. You can't be
censored or deplatformed. Cole is available to answer questions in that forum.

They're also starting up another website to compete with WebMD and similar pharma-
run medical sites. It will eventually be available on DMED.com, which stands for
"decentralized medicine." This site is not yet live, but you can try it later. Cole will have a
page there as well.

Other thought leaders worth tracking down and following include Dr. Peter McCullough,
Dr. Robert Malone, Dr. Pierre Kory, Dr. Paul Marik, Dr. Richard Urso, Dr. Paul Alexander,
and Dr. Kirk A. Milhoan, a pediatric cardiologist, and his wife, Dr. Kim Milhoan, just to
name a few.

> *"These have been wonderful leaders in this movement for truth and sharing
> science," Cole says. "All of us are part of the Global COVID Summit. We are
> 17,000 doctors strong and it's very important that people understand that.*
>
> *I mean, that's more doctors than they have at the CDC or the FDA or the NIH.
> This is a group of critical thinking people standing up for your health, your
> freedom and your right to your own bodily autonomy.*
>
> *I think, going forward, as people are starting to wake up and part of this
> narrative is cracking, let's come back together, let's communicate, let's be kind,
> let's help each other get back to a more loving, peaceful, communicative
> society. I think if we can forgive — obviously, there are things we don't want to
> forget, because we don't want this to happen again — but try to forgive people
> and try to help people 'come to' again.*
>
> *Just come back together in community. I think it's important that we really try to
> circle the wagons again as humanity, and hopefully come back to our senses.*

*That's a hopeful message I would like to share."*

## Sources and References

- [1] Steve Kirsch Substack February 5, 2022
- [2] The Center Square January 1, 2022
- [3] Physiology February 5, 2020 DOI: 10.1152/physiol.00034.2019
- [4] Journal of Photochemistry and Photobiology February 2016; 155: 78-85

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI

| | |
|---|---|
| HUNTER DOSTER, et. al., | : Case No. 1:22-cv-84 |
| Plaintiffs, | : Judge Matthew W. McFarland |
| v. | : |
| Hon. FRANK KENDALL, et. al., | : |
| Defendants. | : |

## ORDER REGARDING PENDING MOTIONS (Docs. 21, 35, 52, 53, 54)

This matter is before the Court on several pending motions, including Plaintiffs'

Motion for Class Certification (Doc. 21), Defendants' Motion to Sever (Doc. 35), Proposed

Intervenors' Motion to Intervene (Doc. 52), Proposed Intervenors' Motion for a

Preliminary Injunction (Doc. 53), and Emergency Motion for a Temporary Restraining

Order by Proposed Intervenors Johnathan Oberg and Johnathan Nipp (Doc. 54). All

motions are fully briefed and ripe for review. The Court's disposition of the Motion for

Class Certification resolves these pending motions.[1]  As explained below, Plaintiffs'

Motion for Class Certification is **GRANTED**.

### BACKGROUND

Plaintiffs in this action are United States Air Force servicemen. Plaintiffs brought

this case, on behalf of themselves and those similarly situated, against multiple Air Force

superiors in their official capacity, including, but not limited to, the Secretary of the Air

---

[1] This Order does not have any effect on Defendants' pending Motion to Dismiss (Doc. 51).

Force and the Surgeon General of the Air Force, as well as the United States of America (collectively, "Defendants"). They seek redress for "the systematic efforts of the Defendants, and those who report to them, to flagrantly violate" the Religious Freedom and Restoration Act ("RFRA") and the Free Exercise Clause of the First Amendment by requiring all Airmen to obtain the COVID-19 vaccination without granting religious accommodation requests for those who oppose receiving the vaccine due to their sincerely held religious beliefs. (Verified Complaint ("Ver. Compl."), Doc. 1, Pg. ID 1.) This Court granted in part Plaintiffs' Motion for a Preliminary Injunction (Doc. 13) on March 31, 2022. The Court ordered the following:

> 1. Defendants, as well as any persons acting in concert with Defendants, are enjoined and restrained from taking any disciplinary or separation measures against the Plaintiffs named in this action for their refusal to get vaccinated for COVID-19 due to their sincerely held religious beliefs. Such disciplinary or separation measures include, but are not limited to, "adverse administrative actions, non-judicial punishment, administration demotions, administrative discharges, and courts-martial." (Dec. of Col. Hernandez, Doc. 27-14, Pg. ID 1941);
>
> 2. Defendants, as well as any person acting in concert with Defendants, are enjoined and restrained from taking any adverse action against Plaintiffs on the basis of this lawsuit or their request for religious accommodation from the COVID-19 vaccine[.]

(Order Granting in Part and Denying in Part Plaintiffs' Motion for Preliminary Injunction and Issuing a Preliminary Injunction, Doc. 47, Pg. ID 3203-04.)

As of June 6, 2022, the Air Force had received 9,062 religious accommodation requests, granting 86 of those requests while denying 6,343 requests. (DAF COVID-19 Statistics – June 7, 2022, https://www.af.mil/News/Article-Display/Article/3055214/daf-covid-19-statistics-june-7-2022/ (last visited June 30,

2022.)) Following such denials, the Air Force had received 3,837 appeals from Airmen whose initial religious accommodation requests were denied. (*Id.*) As of June 6, 2022, the Air Force has granted only 23 of those appeals, denying 2,978. (*Id.*) A quick calculation shows that the Air Force, either through initial requests or appeals, have granted approximately 1% of religious accommodation requests between September 1, 2021, when the Air Force vaccine requirement went into effect, and June 6, 2022. Despite the Air Force's apparent policy and practice of denying virtually all religious accommodation requests, the Air Force has granted 729 medical exemption requests and 1,006 administrative exemption requests since implementing its COVID-19 vaccination requirement policy September 1, 2021. (*Id.*)

Plaintiffs now seek class certification on behalf of:

> All active-duty, and active reserve members of the United States Air Force who: (i) submitted a religious accommodation request to the Air Force from the Air Force's COVID-19 vaccination requirement, where the request was submitted or was pending, from September 1, 2021 to the present; (ii) were confirmed as having had a sincerely held religious belief by or through Air Force Chaplains; and (iii) either had their requested accommodation denied or have not had action on that request.

(Motion for Class Certification ("Motion for Class Cert."), Doc. 21, Pg. ID 952.)

## LAW

This Court "maintains substantial discretion in determining whether to certify a class." *In re Countrywide Fin. Corp. Mort. Lending Practices Litig.*, 708 F.3d 704, 707 (6th Cir. 2013). "The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (citation omitted). "In order to justify a departure from that rule, a

class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Zehentbauer Family Land, LP v. Chesapeake Expl., L.L.C.,* 935 F.3d 496, 503 (6th Cir. 2019).

Class certification first requires the moving party to satisfy the Rule 23(a) prerequisites. *Dukes,* 564 U.S. at 345. These prerequisites are known as "numerosity, commonality, typicality, and adequate representation[.]" *Id.* at 349. Such prerequisites "effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Id.*

Additionally, "[a] class action may be maintained if Rule 23(a) is satisfied and if" Rule 23(b)(1), (2), or (3) is also satisfied. *Id.* at fn. 8. Relevant here, Rule 23(b)(1)(a) is satisfied if "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards or conduct for the party opposing the class[.]" Fed. R. Civ. P. 23(b)(1)(a). Additionally, Rule 23(b)(2) is satisfied if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2).

When determining whether class certification is appropriate, courts must "probe behind the pleadings[,]" because certification is only proper after "a rigorous analysis" into whether Rule 23's prerequisites are met. *Comcast Corp. v. Behrend,* 569 U.S. 27, 33 (2013). Such rigorous analysis "will frequently entail overlap with the merits of the plaintiff's underlying claim . . . because a class determination generally involves

4

considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 33-34 (cleaned up). However, this "rigorous analysis is not . . . a 'license to engage in free-ranging merits inquiries at the certification stage.'" *Zehentbauer Family Land*, 935 F.3d at 504 (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013)).

## ANALYSIS

Plaintiffs argue that class certification is warranted because the Rule 23(a) prerequisites are satisfied and because they satisfy both Rule 23(b)(1)(a) and Rule 23(b)(2). Defendants do not contest Plaintiffs' definition of the putative class, nor do they contest that Plaintiffs established the numerosity requirement. Instead, Defendants challenge the remaining Rule 23(a) prerequisites: commonality, typicality, and adequacy of representation. Additionally, Defendants argue that Plaintiffs fail to satisfy Rule 23(b)(2) but ignore Plaintiffs' argument regarding Rule 23(b)(1)(a).

For the reasons that follow, Plaintiffs have satisfied the Rule 23(a) prerequisites, as well as Rule 23(b)(1)(a) and Rule 23(b)(2). Thus, class certification is warranted.

I. **Plaintiffs Have Satisfied the Rule 23(a) Prerequisites.**

a. Numerosity

First, Plaintiffs must establish numerosity. To satisfy the numerosity requirement, Plaintiffs must show that "the class is so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "No numerical test exists" to satisfy the numerosity requirement. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 541 (6th Cir. 2012). However, "substantial numbers of affected [individuals] are sufficient to satisfy"

such requirement. *Id.*

Here, the Government does not contest that Plaintiffs satisfy Rule 23(a)'s numerosity requirement, and the Court finds that Plaintiffs clearly demonstrate that the putative class is numerous enough to merit certification. In their reply, "Plaintiffs seek a class of: 'All active-duty, and active reserve members of the United States Air Force and Space Force who: (i) submitted a religious accommodation request to the Air Force from the Air Force's COVID-19 vaccination requirement, where the request was submitted or was pending, from September 1, 2021 to the present; (ii) were confirmed as having had a sincerely held religious belief by or through Air Force Chaplains; and (iii) either had their requested accommodation denied or have not had action on that request." (Reply in Support, Doc. 46, Pg. ID 3105.) Plaintiffs contend that such class would include, at the time Plaintiffs filed this motion, over 12,000 Airmen. (Motion for Class Cert., Doc. 21, Pg. ID 955.) Thus, a substantial number of Airmen are affected in this case and joinder of all Airmen seeking religious accommodations is impracticable. Plaintiffs' proposed class clearly satisfies the numerosity requirement.

### b. Commonality

Second, Plaintiffs must establish commonality. Rule 23(a)(2), the commonality prerequisite, "requires that for certification there must be 'questions of law or fact common to the class.'" *In re Am. Med. Sys., Inc.,* 75 F.3d 1069, 1080 (6th Cir. 1996) (quoting Fed. R. Civ. P. 23(a)(1)). While Rule 23(a)(2) "speaks of 'questions' in the plural," the Sixth Circuit has held that "there need only be one question common to the case." *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 397 (6th Cir. 1998).

6

"Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury[,]'" not merely demonstrate that the class members "have all suffered a violation of the same provision of law." *Dukes*, 564 U.S. at 349-50 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 (1982)). Thus, "their claims must depend upon a common contention." *Id.* at 350. And the common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Plaintiffs argue that Rule 23(a)(2) is satisfied because "[a]ll of the claims here involve what is, essentially, claims for religious discrimination" and such claims all have "common elements of proof to prove the claims at issue for each Plaintiff and for the class." (Motion for Class Cert., Doc. 21, Pg. ID 957.) Defendants disagree, arguing that Plaintiffs must either: "(1) show that the employer 'used a biased testing procedure' common to the whole proposed class, or (2) provide '[s]ignificant proof that an employer operated under a general policy of discrimination' that would apply to the class" as provided in *Dukes*, 564 U.S. at 353. (Response in Opposition ("Response in Opp."), Doc. 34, Pg. ID 2205.) Additionally, Defendants argue that, due to the individualized analysis required under RFRA, commonality cannot be established.

Here, Plaintiffs and the putative class members have all allegedly suffered the same injury: violation of their constitutional rights. A putative class would consist only of Airmen who have submitted religious accommodation requests, had an Air Force Chaplain define their religious beliefs as sincerely held, and yet their religious

7

accommodation requests have been denied or delayed. The facts show Defendants have engaged in a pattern of denying religious accommodation requests. Indeed, of the over nine thousand religious exemption requests, only 109 have been granted by either initial determination or appeal. ((DAF COVID-19 Statistics – June 7, 2022, https://www.af.mil/News/Article-Display/Article/3055214/daf-covid-19-statistics-june-7-2022/ (last visited June 30, 2022.)).) This amounts to only 1% of religious accommodation requests being granted. (*Id.*) "[I]t is hard to imagine a more consistent display of discrimination." *U.S. Navy SEALs 1-26 v. Austin*, No. 4:21-cv-01236-O, 2022 WL 1025144, *5 (N.D. Tex. Mar. 28, 2022).

Importantly, damages stemming from the alleged violation need not be identical for this Court to grant class certification. *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988) ("No matter how individualized the issue of damages may be, these issues may be reserved for individual treatment with the question of liability tried as a class action. Consequently, the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible"). Thus, the putative class members face the same injury: violation of their constitutional freedom by Defendants' clear policy of discrimination against religious accommodation requests.

Additionally, Plaintiffs' claims are capable of class-wide resolution. A finding in favor of Plaintiffs on the RFRA or Free Exercise claims also resolves such claims by the putative class because they involve the same common analysis: Does Defendants' policy and practice of discrimination by denying substantially all religious accommodation

requests by Airmen who maintain sincerely held religious beliefs further a compelling governmental interest and is such policy and practice the least restrictive means to achieve compelling governmental interests, if any exist? A finding for Plaintiffs or Defendants would result in class-wide resolution, satisfying the commonality requirement.

Defendants' argument that, due to the "highly individualized nature of RFRA claims[,]" commonality cannot be established, fails. (Response in Opp., Doc. 34, Pg. ID 2203.) Under these facts, analysis of the violation itself does not need to be "highly individualized" because it arises from Defendants' overt policy of denying substantially all religious accommodation requests. The unity of analysis as to the violation establishes commonality here. Whether a separate analysis is necessary regarding individualized damages does not affect this conclusion. *See Sterling*, 855 F.2d at 1197. Thus, Defendants' argument fails.

Thus, because putative class members have suffered the same injury as Plaintiffs and class-wide resolution is possible for Plaintiffs' RFRA and Free Exercise claims, Plaintiffs have satisfied the commonality requirement pursuant to Fed. R. Civ. P. 23(a)(2).

c. Typicality

Third, Plaintiffs must establish typicality. To satisfy the typicality requirement, Plaintiffs must establish that "the claims or defenses of the representative parties are typical of the claims or defenses of the class . . ." Fed. R. Civ. P. 23(a)(3). "The commonality and typicality requirements of Rule 23(a) tend to merge." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, fn. 13 (1982). This is because "[b]oth serve as guideposts

9

for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id.*

"[M]any courts have found typicality if the claims or defenses of the representatives and the members of the class stem from a single event or a unitary course of conduct, or if they are based on the same legal or remedial theory." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 509 (6th Cir. 2015) (citing Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7A Federal Practice and Procedure § 1764 (3d ed. 2005)). The Sixth Circuit has explained that the typicality test "limits the class claims to those fairly encompassed by the named plaintiffs' claims." *Sprague*, 133 F.3d 388, 399 (6th Cir. 1998). As the *Sprague* court explained:

> Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct . . . . A necessary consequence of the typicality requirement is that the representative's interests will be aligned with those of the represented group, and in pursuing his own claims, the named plaintiff will also advance the interests of the class members.

*Id.* (quotations omitted).

"The premise of the typicality requirement is simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Id.*

Plaintiffs argue that typicality is established here for the exact reasons that commonality is established: because the class claims would all involve "claims of religious discrimination and [would be] centered upon the Government's granting of

thousands of administrative and medical exemptions, and systemic denial of religious exemptions." (Motion for Class Cert., Doc. 21, Pg. ID 957.) The Government argues that such similarities are not enough because the roles, responsibilities, levels of proximity, likelihood of deployment or travel, and ability to telework varies from Airmen to Airmen. Additionally, the Government argues that because "Plaintiffs' putative class [would] also include[] service members with a broad variety of religious beliefs and, consequently, different reasons for objecting to the COVID-19 vaccine[,]" typicality cannot be established. (Response in Opp., Doc. 34, Pg. ID 2215.)

Typicality is established here. Plaintiffs seek relief under RFRA and the Free Exercise Clause of the First Amendment. These are also the only claims which would be pursued by the putative class. Just as in the commonality element, Plaintiffs' claims and the class claims stem from a unitary course of conduct and are based on the same legal and remedial theory. "The factual circumstances need not be identical for each of the class members; some variation among members is permissible." *U.S. Navy SEALs 1-26*, 2022 WL 1025144 at *7. Thus, the claims are typical of, and, in fact, identical to, the claims of the entire class.

Defendants' argument that factual differences between putative class members disallow a finding of typicality is not persuasive. Defendants appear to again argue that the Court must individually analyze each Airmen's claims on the one hand, while systematically denying all religious accommodation requests despite the factual differences Defendants claim the Court should consider on the other. The Court appreciates there may be minor factual differences between the members of the class,

11

including roles, responsibilities, levels of proximity, likelihood of deployment or travel, and ability to telework, as well as different religious beliefs and reasons for objecting to the COVID-19 vaccine. However, these minor differences do not outweigh that Defendants' typical response when receiving a religious accommodation request is to deny it. The typicality of the putative class is reflected in the fact that Defendants have indiscriminately denied almost all religious accommodation requests and their use of form letters to deny the accommodation requests. (*See* DAF COVID-19 Statistics – June 7, 2022, https://www.af.mil/News/Article-Display/Article/3055214/daf-covid-19-statistics-june-7-2022/ (last visited June 30, 2022.); *see also* Exhibit Comparison of Command Religious Accommodation Denials, Doc. 46-3; Exhibit Comparison of Air Force Surgeon General Religious Accommodation Denials, Doc. 46-4.) Such facts suggest that Defendants do not individually weigh each applicant's belief or circumstances in issuing their response, further cementing the typicality of the class.

Furthermore, these factual differences do not defeat typicality. Plaintiffs' claims are typical of the class because the claims stem for a unitary course of conduct: Defendants' overt policy to deny virtually all religious accommodation requests. And, in cases where the executive implements a COVID-19 vaccine requirement and discriminates against religious accommodation requests, this Court is not the first to find that such conduct establishes typicality. *See U.S. Navy SEALs 1-26*, 2022 WL 1025144.

Thus, because the class claims are fairly encompassed by Plaintiffs' claims and such claims all stem from Defendants' unitary course of conduct, Plaintiffs have satisfied the typicality requirement pursuant to Fed. R. Civ. P. 23(a)(3).

### d. Adequacy of Representation

Fourth, Plaintiffs must establish adequacy of representation. Rule 23(a)(4) allows a court to certify a class only if "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The commonality and typicality requirements "also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest." *Dukes*, 564 U.S. at 378, fn. 5 (quoting *Falcon*, 457 U.S. at 157-58, fn. 13). The Sixth Circuit has articulated a two-prong test to determine adequacy-of-representation: "(1) the representative must have common interests with unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *In re Am. Med. Sys., Inc.*, 75 F.3d at 1083.

Plaintiffs argue that the two-prong adequacy-of-representation test is satisfied here. First, Plaintiffs argue that "Plaintiffs and the Class Members possess the same interest and suffered the same injury: each of them requested a religious accommodation and have either had it denied, or have not had it acted upon . . ." (Motion for Class Cert., Doc. 21, Pg. ID 958.) Second, Plaintiffs argue that the second prong is met because "Plaintiffs are represented by qualified counsel with extensive experience prosecuting class actions, constitutional matters, and religious freedoms cases." (*Id.*) However, Defendants argue that adequacy-of-representation is not satisfied because Plaintiffs and the proposed putative class possess conflicts of interests due to separately filed lawsuits "around the country challenging the COVID vaccine requirements for members of the

13

Air Force[,]" especially considering three separate lawsuits brought by Airmen also purport to bring class action claims.[2] (Response in Opp., Doc. 24, Pg. ID 2219.)

First, Plaintiffs have common interests with unnamed members of the class. The class includes Airmen who have been denied or delayed religious accommodations from receiving a COVID-19 vaccine due to their sincerely held religious beliefs, just like Plaintiffs. Despite the nine thousand Airmen seeking religious accommodations, less than one percent have been granted. Thus, thousands of Airmen with sincerely held religious beliefs, all of whom fall into the class, are facing punishment, including involuntary separation. Plaintiffs and the class all have a common interest in injunctive relief disallowing Airmen who seek religious accommodations from being punished for abstaining from receiving the COVID-19 vaccine despite such sincerely held religious beliefs. Therefore, the first prong of the adequacy-of-representation test is satisfied.

Second, it appears that the class representatives and counsel will vigorously prosecute the class through qualified counsel. As described below, the Court finds Plaintiffs' counsel to be qualified to represent the class. Counsel all have experience in representing classes actions and individuals seeking remedy for constitutional violations. (*See* Declaration of Christopher Weist, Doc. 21-1.)  Thus, the second prong of the adequacy-of-representation test is also satisfied.

The Court is not persuaded by Defendants' conflicts of interest argument. The

---

[2] Additionally, Defendants argue that multiple Plaintiffs and the putative class have not exhausted their administrative remedies, which bars a finding that common interests exist. (Response in Opp., Doc. 34, Pg. ID 2221.) This Court has already ruled that such argument is not persuasive because exhaustion is futile. (Order Granting in Part and Denying in Part Plaintiff's Motion for Preliminary Injunction and Issuing a Preliminary Injunction, Doc. 47, Pg. ID 3182.) Thus, the Court need not address such argument.

Northern District of Texas ruled that no conflicts of interest existed in a case nearly identical to this case, and that court's reasoning is persuasive. In *U.S. Navy SEALs 1-26*, the defendants, all Navy executives and officials, argued that class certification was not warranted of all Navy servicemen due to the conflict created by concurrent litigation. 2022 WL 1025144 at *7. However, the court rejected the argument, stating that "the injunctive relief that Plaintiffs seek will benefit all religiously opposed Navy servicemembers who are presently involved in other mandate litigation. Potential class members will not be harmed by class-wide relief. Likewise, Plaintiffs here will benefit from injunctive relief granted in other courts." *Id*. The court then found that no conflicts exist, and the plaintiffs satisfied the adequacy of representative requirement. *Id*. at *8.

This Court agrees with the Northern District of Texas's ruling in *U.S. Navy SEALs 1-26*. Simultaneous litigation does not present a conflict of interest for the class representatives or counsel. This is because the injunctive relief would benefit all religiously opposed Airmen who are currently pursuing litigation for the same purpose as Plaintiffs. And Plaintiffs would benefit from injunctive relief granted in other courts. Thus, Defendants' argument that Plaintiffs cannot establish adequacy of representation is unavailing.

Because Plaintiffs satisfied both prongs of the adequacy-of-representation test, Plaintiffs have shown adequacy of representation as required by Fed. R. Civ. P. 23(a)(4). Therefore, Plaintiffs have satisfied Fed. R. Civ. P. 23(a).

II.     **Plaintiffs Have Satisfied Rule 23(b).**

In order for the Court to grant class certification, Plaintiffs must also show that

15

they may maintain a class action under Rule 23(b)(1), (2), or (3). *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiffs seek certification of the class pursuant to Rule 23(b)(1)(A) and (2).

Rule 23(b)(1)(A) covers cases for which separate lawsuits by individual litigants would risk establishing "incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). This provision applies to cases where the defending party is legally obligated to treat the members of the class alike or must treat all alike as a matter of practical necessity. *Amchem*, 521 U.S. at 614.

The other potential class vehicle here, Rule 23(b)(2), permits class actions for declaratory or injunctive relief when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

For the reasons set forth below, the proposed class is certifiable under both Rule 23(b)(1)(A) and Rule 23(b)(2).

### a. Plaintiffs Have Satisfied Rule 23(b)(1)(A).

Plaintiffs argue that this case is cognizable under Rule 23(b)(1)(A) because the First Amendment and RFRA oblige the Defendants to treat the members of the class alike. The Court agrees.

To start, Defendants do not contest that the proposed class is certifiable under Rule 23(b)(1)(A). And, upon examination, the class may proceed under that provision. Rule 23(b)(1)(A) serves to prevent defendants from being legally bound by contradictory

16

rulings. It is designed to avoid injunctive or declaratory "whipsawing" where different courts require the same defendant to abide by incompatible or contradictory rulings. *Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 664 (D.N.M. 2019). The concern under this provision is not primarily that different lawsuits would yield different results for different plaintiffs; rather, the concern is that different judicial outcomes would impose conflicting obligations on the same defendant or group of defendants. *See id.; see also Snead v. CoreCivic of Tennessee, LLC*, No. 3:17-CV-0949, 2018 WL 3157283, at *14 (M.D. Tenn. June 27, 2018).

This case presents just such a risk. Similar claims may be brought in another court. That court and this Court may arrive at incompatible conclusions with respect to Airmen who seek religious exemptions from the vaccine mandate. One court may find that Defendants may enforce its vaccine mandate over and against religious objections, and another court may find the opposite. Such a scenario would prevent Defendants from pursuing a uniform course of conduct towards servicemembers. *Compare Clemons v. Norton Healthcare Inc. Ret. Plan*, 890 F.3d 254, 280 (6th Cir. 2018) (affirming certification under Rule 23(b)(1)(A) for purposes of interpreting a retirement plan, because individual actions would have risked establishing incompatible standards of conduct for the defendant); *Spurlock v. Fox*, No. 3:09-CV-00756, 2012 WL 1461361, at *3 (M.D. Tenn. Apr. 27, 2012) (finding Rule 23(b)(1)(A) certification appropriate so that defendants could pursue a uniform course of conduct regarding a re-zoning plan) *with Pipefitters Loc. 636 Ins. Fund v. Blue Cross Blue Shield of Michigan*, 654 F.3d 618, 633 (6th Cir. 2011) (finding Rule 23(b)(1)(A) certification inappropriate because there was no indication that

17

individual adjudications would subject defendant to conflicting affirmative duties).

Accordingly, there exists here the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct under which Defendants would have to comply. Because this case presents a (b)(1)(A) risk, the proposed class is certifiable under that provision.

### b. Plaintiffs Have Satisfied Rule 23(b)(2).

Plaintiffs also maintain that a Rule 23(b)(2) class is appropriate, because Defendants' policy on vaccines applies to the class as a whole such that the entire class is entitled to declaratory and injunctive relief. Defendants, on the other hand, argue that Plaintiffs seek individualized determinations with regard to their religious accommodation requests, rather than relief that addresses a singular, discrete issue that affects the entire putative class. They contend that the analysis in religion cases is individualized and specific, requiring a court to determine whether each and every class member holds a sincerely held religious belief that precludes the use of a vaccine. The Court agrees with Plaintiffs on this point and concludes that the proposed class may also proceed under Rule 23(b)(2).

A class may proceed under (b)(2) if the parties opposing the class have "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). This provision is met when the relief sought affects the entire class at once. *Dukes*, 564 U.S. at 361–62. To qualify for class-wide injunctive relief, class members must have suffered harm in essentially the same way and injunctive relief must

18

predominate over monetary damages. *U.S. Navy SEALs 1-26,* 2022 WL 1025144, at *8.

The proposed class satisfies the (b)(2) requirement. Defendants' attempt to characterize the relief sought as hinging on individualized determinations concerning their religious accommodation requests and sincerely held religious beliefs. But the relief the proposed class seeks is the same: a religious accommodation relating to the COVID-19 vaccine mandate. And they have been harmed in "essentially the same way." *Id.* They face separation from the Air Force and other disciplinary measures. A single injunction would provide relief to the entire class. *See Dukes,* 564 U.S. at 360. Indeed, the main purpose of a (b)(2) class is to provide relief through a single injunction or declaratory judgment. *Cole v. City of Memphis,* 839 F.3d 530, 542 (6th Cir. 2016). Because Defendants have uniformly maintained a policy of overriding Airmen's religious objections to the COVID-19 vaccine, they have acted "on grounds that apply generally to the class." Fed. R. Civ. P. 23(b)(2). Moreover, the class definition requires that a Chaplain certify that the airman's religious beliefs are sincerely held. Finally, a single injunction would provide the proposed class with the relief they seek from the harm they stand to suffer. *U.S. Navy SEALs,* 2022 WL 1025144 at *9. Accordingly, the class may be certified under Rule 23(b)(2).

III.    **Temporary Restraining Order Covering the Class**

Because the Plaintiffs have satisfied the necessary Rule 23 requirements, the Court will certify the following class:

> All active-duty and active reserve members of the United States Air Force and Space Force, including but not limited to Air Force Academy Cadets, Air Force Reserve Officer Training Corps (AFROTC) Cadets, Members of

19

the Air Force Reserve Command, and any Airman who has sworn or affirmed the United States Uniformed Services Oath of Office and is currently under command and could be deployed, who: (i) submitted a religious accommodation request to the Air Force from the Air Force's COVID-19 vaccination requirement, where the request was submitted or was pending, from September 1, 2021 to the present; (ii) were confirmed as having had a sincerely held religious belief by or through Air Force Chaplains; and (iii) either had their requested accommodation denied or have not had action on that request.

In its broad discretion to modify class definitions, the Court has modified the class definition to more precisely delineate the scope of the class. *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). Furthermore, to facilitate briefing and shepherd this matter to the next pretrial stage, the Court will issue a temporary restraining order prohibiting Defendants from enforcing the vaccine mandate against any of the above Class Members for the next 14 days following the entry of this Order. (*See* Doc. 13, Plaintiffs' Motion for an Emergency Temporary Restraining Order). Within that timeframe, the parties will advise the Court, as laid out below, as to whether any significant change precludes extending the current preliminary injunction to include all Class Members.

IV. Rule 23(g)

This Court may appoint class counsel, pursuant to Fed. R. Civ. P. 23(g). "In appointing class counsel, the court . . . must consider: (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class[.]" Fed. R. Civ. P. 23(g)(1)(A). Additionally, "the

court . . . may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class[.]" Fed. R. Civ. P. 23(g)(1)(B).

As demonstrated by the Declaration of Christopher Wiest and its exhibits, each counsel for Plaintiffs has experience in handling complex litigation and constitutional rights violation cases. (*See* Declaration of Christopher Weist, Doc. 21-1.) Additionally, such experience demonstrates that counsel all have knowledge of the applicable law in this case. Lastly, based on the advocacy of Plaintiffs' counsel thus far, each have exhibited that they are willing to commit the necessary resources to adequately represent the Plaintiffs' and putative class members' interests in this case. Accordingly, the Court will appoint Plaintiffs' counsel as class counsel in this matter.

## CONCLUSION

For the foregoing reasons, the Court **ORDERS** the following:

1. Plaintiffs' Motion for Class Certification (Doc. 21) is **GRANTED**.

2. Such class **SHALL** consist of active-duty and active reserve members of the United States Air Force and Space Force, including but not limited to Air Force Academy Cadets, Air Force Reserve Officer Training Corps (AFROTC) Cadets, Members of the Air Force Reserve Command, and any Airman who has sworn or affirmed the United States Uniformed Services Oath of Office and is currently under command and could be deployed, who: (i) submitted a religious accommodation request to the Air Force from the Air Force's COVID-19 vaccination requirement, where the request was submitted or was pending, from September 1, 2021 to the present; (ii) were confirmed as having had a sincerely

held religious belief by or through Air Force Chaplains; and (iii) either had their requested accommodation denied or have not had action on that request.

3. Defendants' Motion to Sever (Doc. 35) is **DENIED AS MOOT**.

4. Proposed Intervenors' Motion to Intervene (Doc. 52), Proposed Intervenors' Motion for Preliminary Injunction (Doc. 53), and Emergency Motion for Temporary Restraining Order by Proposed Intervenors Johnathan Oberg and Johnathan Nipp (Doc. 54) are **DENIED WITHOUT PREJUDICE**.

5. Plaintiffs' counsel is **APPOINTED** as class counsel in this matter.

6. The Court **ISSUES** a **TEMPORARY RESTRAINING ORDER** prohibiting Defendants from enforcing the vaccine mandate against any Class Member, to expire 14 days from the entry of this Order.

7. Defendants are **ORDERED** to file a supplemental brief, no later than July 21, 2022 and no more than ten (10) pages in length identifying why this Court should not grant a class-wide preliminary injunction. Plaintiffs may file a response, limited to ten (10) pages, to Defendants' supplemental brief by July 25, 2022.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____
JUDGE MATTHEW W. McFARLAND

# Covid protocol successful

Over 1,130 covid patients treated with a nutrition-only protocol, with just one death

COVID patients in the UK are being deliberately denied information on the huge success of non-jab approaches to treating the illness, despite widespread reports of the success, for example, of high-dose vitamin D (4,000 IU/day) and ivermectin in other countries (Japan recently licensed the latter across the country, resulting in a significant reduction in cases and deaths).

In the U.S. Dr David Brownstein and his partners, based in Orchard Lake, Michigan, reported on their success with 107 consecutively presenting patients treated with nutrition only, of which all survived, in 2020.! That number is now in excess of 1,130 - with only one death!

Using a nutritional and oxidative approach, the report summarised their method, which is continuing to produce success with natural therapies, which work by providing support to the innate and adaptive immune system.

The average age in their group is 55 years and they include many



Dr David Brownstein

overweight or obese, those with underlying comorbidities and those of Black or Asian origin (BAME). Nearly 20% of this cohort was over 70 years old. All of those four groups also tend to be highly vitamin D deficient.

This is the same approach that they have been using for over 20 years in treating all viral and bacterial infections. This therapy was designed to support the immune system during an infectious time period.

The treatment protocol used was:

At the first sign of illness, such as a cough, fever, sore throat, etc, the

**by SIMON BEST**

patients were instructed to take orally a four-day course of 100,000 IU of vitamin A (not beta carotene), 1,000 mg of vitamin C every hour to bowel tolerance (loose stools), 50,000 IU of vitamin D3 and 25 mg of iodine.

Furthermore, the patients were advised to nebulise a dilute solution of hydrogen peroxide (0.3%) and iodine (1 drop of 5% Lugol's solution) every waking hour until symptoms improved. If further care was needed, the patients were treated with intravenous doses of vitamin C (2,500 mg, IVC), hydrogen peroxide and intramuscular ozone. No drugs were administered, except steroids occasionally, and no experimental 'vaccines'.

To date, they have had precisely one patient die! And there were just 12 hospitalisations out of over 1,130 patients. They have also had very few patients suffering from long-term effects secondary to covid-19: 15 of the cohort (2.9%). Most of these patients improved on a holistic regimen and no longer suffer from prolonged symptomology. As previously, Dr Brownstein hopes to publish these results in due course, though this is being made increasingly difficult due to journals rejecting such articles because they don't want to upset their drug advertisers!

"Becoming ill with SARS-CoV-2 and developing covid-19 is not a death sentence", says Dr Brownstein. "For most it is a mild-to-moderate, flu-like illness. When treated early with items that nourish and support the immune system, patients suffering from covid-19 can make a full and uneventful recovery."

- ¹ *Brownstein D et al. A novel approach to treating Covid-19 using nutritional and oxidative therapies. Science, Public Health Policy and The Law, 2020;2:4-22.*

- *Please note this article is for educational purposes and is not offering medical advice*

- *Simon Best has a medical journalist/editor for over 40 years and edits the quarterly Caduceus magazine, focused on health, healing and spirituality, since 1987 - www.caduceus.info*

- *Simon is also a member of Journalists Against Covid Censorship - www.holding-the-line.com*

# Making cacao the new coffee



A MAN from Withington, Manchester, is on a mission to make cacao the new coffee. Spiritual healer and founder of Full Power Cacao, Liam Browne has been a pioneer of the South and Central American ceremonial drink ever since discovering its healing properties in Guatemala in 2012, and is now one of the biggest suppliers in the UK.

Liam, known by many as "The Cacao Guru", is a spiritual healer, yoga teacher, author, podcaster and founder of Stone Cold Sober Retreats and Festivals. When on a visit to Guatemala for the end of the Mayan calendar in 2012, he met the "Chocolate Shaman" on the majestic Lake Atitlan and after being introduced to the magic of cacao, his life was forever changed.

Liam said: "I cannot recommend cacao and its health benefits enough. I have been enjoying the benefits of cacao since 2012 but first started testing and researching different origins thoroughly in 2019. After searching throughout the Central and South American regions, I ethically sourced the authentic, powerful, magical and heart-opening plant medicine from Venezuela and set out to share it with as many people as possible."

Cacao comes from the edible seed of the cacao tree, which is native to tropical regions such as Central and South America, and has been used by indigenous people for centuries due to its healing properties and health benefits. Its Greek name, Theobroma Cacao,

literally means 'Food of the Gods' and is now classed by many as a superfood that can be enjoyed in warm drink form.

Liam explained: "There are so many benefits of cacao. It's a natural anti-depressant due to the magnesium and potassium it contains and it also has beneficial natural compounds such as serotonin, phenylethylamine and anandamide - all of which have been shown to enhance mood. It's also packed with flavonoids that can lower blood pressure, improve the blood flow to the heart and brain, and help reduce the risk of dementia."

He continued: "Cacao contains 23% of natural protein, perfect for those looking to increase their protein intake, and it contains 33% fibre. It has 15 times more antioxidants than blueberries so it's great for the skin and it's also a powerful aphrodisiac. The benefits of cacao are endless and it's becoming more and more popular as a healthy alternative to coffee."

One of the pioneers of cacao in the UK, Liam is an expert in the field. Ever since creating Full Power Cacao, he has been on a mission to share the medicine with as many people as possible - with an online shop and commercial supply to cafes, restaurants and shops. He also hosts Cacao Ceremonies, incorporating sacred shamanic and yogic traditions with his own twist, and offers Cacao Teacher Training Courses.

Liam said: "Cacao is exploding here in the UK, as more and more people learn about its benefits. I cannot state enough how good for

you this sacred drink is, and by replacing coffee with cacao you'll feel a huge difference on so many levels. In addition to there being so many health benefits, cacao positively works with the chakras so it has deep spiritual powers too. I genuinely believe cacao can become the new coffee."

Liam's cacao business has gone from strength to strength - educating people on the benefits of cacao and supplying to thousands of people and businesses across the UK. In March 2022 he went on a UK tour, hosting Cacao Ceremonies at venues throughout England, Scotland and Wales, and he has Teacher Training courses scheduled for the rest of the year.

Liam summarised: "Everyone I know who has embraced this sacred medicine has felt its profound powers and never looked back. It can ease anxiety, apathy, depression, headaches, insecurity, irritability and more, and it is good for your mood, blood, the heart - as well as containing magnesium, potassium, protein, flavonoids, fibre, antioxidants and more. Try swapping coffee with cacao - I guarantee you'll feel the difference!"

Liam's business has a website where individuals and businesses can purchase his ethically sourced Venezuelan cacao. The website has more information about the benefits of cacao and details of the cacao ceremonies and training courses available. Ethically sourced from Venezuela, it is blessed in Manchester with the highest vibrational energy.

■ *https://fullpowercacao.co.uk*

# Overcoming addiction

by CLIVE DE CARLE

IT would appear that thirty per cent of the population worldwide has addictive tendencies. This is partly to do with the fact that not all of us have a fully functioning dopamine system and a lack of dopamine is a problem for the addict.

The problem with dopamine is that we have in our brain a regulatory mechanism that endeavours to keep our dopamine levels stable. When this happens, the addict compensates by increasing the level of intake of the stimulant. In response, the brain down-regulates dopamine absorption and a vicious cycle of addiction can begin. Getting that dopamine rush becomes increasingly elusive, and people find themselves checking their phone constantly to see notifications, or smoking, drinking, overeating, gambling - whatever somebody's addiction is, often leading to excess.

This dopamine rush is what we know as pleasure. Happiness, on the other hand, releases serotonin, and the only mechanism that reduces serotonin in the body - as you can't have too much happiness - is dopamine. This means that the more pleasure you seek, the more happiness you lose.

What turns off our addictive tendencies? Amino acids can be very good at this, particularly the essential amino acids in high doses for 3 days. An alcoholic came to see me several years ago, and he explained that he

didn't really need to eat food as much because four bottles of white wine a day gave him all the calories he needed! Within one day of taking the amino acids in a significantly high dose, he was happily off the booze for the first time in 20 years.

There is a second supplement which is even more powerful, and this is a special kind of selenium in liquid form. The results that I've seen using this material have been extraordinary. One of my clients who had been on ADHD medication for almost 20 years, used this selenium and found that they were able to come off the medication with an ease which had never happened before. Research



Photo: Mathew Macquarrie

was done in the 1980s in New York where they showed the ability of this particular type of selenium to help people come off methadone and heroin. Selenium is also famous for helping with hair and the scalp. I had a client just recently who found that their hair colour returned after supplementing with selenium. Unfortunately this result does not happen for everybody and it didn't happen for me!

The most recent supplement I've been recommending is not an essential mineral, but rather an extract from sugar cane. I find it ironic that sugar, which is doing so much harm health-wise, can in this particular form, be the trigger for the body to return to its

natural, self-repairing state. This type of nutritional supplement is called an adaptogen because it helps the body to adapt to whatever situation it is exposed to.

Policosanol has been used as a supplement for anti-aging for some 25 years, but this version is made in an extraordinary way and has been given the name Nano Policosanol. Some testimonials have reported improvements to their hormonal health. This includes women who have had their menopause symptoms stop. One knew this result was caused by the Nano Policosanol because the lady stopped taking it for a month and the symptoms came back. When she resumed taking the supplement, her menopausal symptoms disappeared again.

Others have reported their asthma disappearing; better sleep; more energy; better mood; skin improvements, elimination of, or a reduction in pain, aching and stiffness; relaxation; increased calmness; finding they are no longer pre-diabetic; clarity of thought, strengthened immunity for the whole family; appetite changing (as in not eating too much anymore); weight correcting itself, whether too high or too low and improved digestion, to name but a few.

Some people found benefit on day one, others found the benefits occurred after a few months. I would recommend using the product for six months which would give enough time for most issues to be impacted, but conversely some people have noticed

their blood pressure balance out in just days.

It's not that the Nano Policosanol is the remedy for specific issues that one could put into a list, but rather it appears to act as a booster to the body's repair systems, with the body doing the decision-making as to what issue it is going to have a positive benefit on. Other results that people have reported have included more vitality, better mood, skin tone improving, and wrinkles and spots disappearing. It also works particularly well with burns and injuries.

This material is made in Switzerland and the quality, as with everything that I like to concern myself with, is second to none. Interestingly, as you may know, it is impossible to patent a natural material. Nano Policosanol was an exception. Because the results were so extraordinary, it was granted several patents. Nobody could have predicted from the ingredients and methodology that such incredible results could occur, thus, the patent was granted incredibly rapidly. The Nano Policosanol works with the vitamin D pathways, and if any of you know about OcMaf, this also worked with the vitamin D pathways.

I would recommend watching my videos on the subjects above, I like BrandNewTube as the best video platform. You can also see the clinical studies on the website nanopolicosanol.com

◼ www.clivedecarle.com

# Legal challenge against injecting 5-11 year-olds

Children's Covid Vaccine Advisory Council (CCVAC) launches major legal challenge

In an unprecedented move, members of the British medical establishment, convened by the CCVAC, are launching a legal challenge against the UK Government's 'offer' of a covid 'vaccine' to healthy 5-to-11 year-olds, on behalf of a British mother and her children.

The action is supported by Beverley Turner, a radio and TV personality and leading campaigner for child protection.

by CHILDRENSUNION.ORG

It also employs the same top legal team that is challenging the government on the 12-15 year-old roll-out, but for official reasons, the team is obliged to open a new case for this younger age group.

This could be the last chance to get answers; in the absence of an independent critical media or political opposition on this issue, this is the only opportunity there will ever be to force the government to account for its decision.

Without the funds to bring this case, officials will get off unchallenged and we will have set a dangerous precedent for healthcare policy in this country.

We have an extremely strong argument, and while this does not necessarily translate into a high

> Our legal team will dismantle this grossly irresponsible policy, piece by piece, and show:
>
> ◼ There is no benefit to children or anyone else
> ◼ There is demonstrable risk of life-changing injury
> ◼ Adverse reactions will be hundreds of thousands
> ◼ Some adverse reactions will be extremely serious and some deaths are to be expected

probability of winning in court, it is of vital importance that these arguments are made - and the government's response recorded - to form part of an immutable

public record.

The government has recently begun to climb down on many covid policies as the evidence becomes too obvious to ignore, but it is stubbornly pushing ahead with the least logical, most reckless policy of all - experimental pharmaceutical interventions on our children.

The complete lack of any risk-benefit case for children is set out in a letter that has been sent to the government, with two 'must-read' annexes that list the facts and evidence in support.

Everything the government has been doing in an insult to free and informed consent. The weakness of the government's position is signalled by the word 'offer' - intended to imply freedom of choice, when parents and children have been denied basic information

on the vaccine and its side-effects (on the basis they are unqualified to judge the risk). This is not informed consent, it is a false choice.

Several countries, Norway and Sweden among them, have already refused to give the shots to children on the basis they provide no benefit. The UK must follow!

There is an emergency, but it's not from 'Omicron'. It's from this negligent policy.

Please visit our website for jaw-dropping facts and excellent resources for parents to share. Read the material and see for yourself, then help us make a difference.

Please pledge your support for this case. The costs will be in the six figures and every donation counts.

◼ https://childrensunion.org/ccvac-legal-challenge/

# European Medicines Agency investigates menstrual problems after covid jabs

by PAUL BENNETT

THE European Medicines Agency (EMA) is currently reviewing a possible link between menstrual irregularities and covid shots after thousands of women reported changes post-injection.

On the February 11, the EMA issued a statement on their official EU website: "The Pharmacovigilance Risk Assessment Committee (PRAC) is assessing reported cases of heavy menstrual bleeding (heavy periods) and absence of menstruation Amenorrhoea) with the covid-19 vaccines Comirnaty and Spikevax.

"The Committee had previously analysed reports of menstrual disorders in the context of safety summary reports for covid-19 vaccines approved at the time that the evidence did not support a causal link between the vaccines and menstrual disorders.

"In view of spontaneous reports of menstrual disorders with both vaccines and/or findings from the literature, the PRAC decided to further

assess occurrences of heavy periods or Amenorrhoea following vaccination.

"Menstrual disorders are very common and can occur with a wide range of underlying medical conditions as well as from stress and tiredness. Cases of these disorders have also been reported following covid-19 infection.

"Heavy periods may be defined as bleeding characteristics by a volume which may interfere with the woman's physical, social, emotional, and material quality of life. Amenorrhoea may be defined as the absence of menstrual bleeding for three or more months in a row.

"After reviewing the available evidence, the PRAC decided to request an in-depth evaluation of all available data, including reports from spontaneous reporting systems, clinical trials, and the published literature.

"At this stage, it is not yet clear whether there is a causal link between covid-19 vaccines and the reports of heavy periods or Amenorrhoea. There

is also no evidence to suggest that covid-19 vaccines affect fertility.

EMA will communicate further when more information becomes available."

A major study from the Norwegian Institute of Public Health examined the link between covid vaccines and menstrual changes. Results from the study found that there was a high incidence of menstrual changes after inoculation. The study collected data from over 6,000 women aged 18-30.

Project Leader at the Norwegian Institute of Public Health, Dr Lill Trogstad reported: "Menstrual changes are very common, and even before vaccination, almost four out of ten young women reported that they had experienced such changes. However, in this study we see that more women experienced changes after the first or second vaccine dose."

Government and health officials who coerced millions to get jabbed under the guise of 'safe and effective' vaccines need to be answerable to the public, as adverse reactions keep emerging all the time.



# Switzerland rejects funding for state media corporations



by PAUL BENNETT

SWITZERLAND has voted to strongly reject government plans to increase state funding for media organisations. The referendum was directly related to a Bill approved by the Swiss Government in Bern to grant aid for media companies around 150 million Swiss francs a year.

Switzerland utilised its direct political decision-making process by holding a referendum on the issue. Opponents of the Bill gathered thousands of signatures in a petition to set up the vote, using the unique system of democracy in Switzerland known as 'direct democracy'.

Swiss French language newspaper Le Temps reacted to the referendum results by saying: "Whatever else one says, Sunday February 13 will force editorial offices to question themselves. The results show that the media are seen as complacent and subject to external influence... The only possible answer is to work even harder, to constantly search for opinions that contradict one's own, to continue investigative

journalism and field work, and to be innovative. The Swiss media will have no choice but to prove that they are indispensable even in a society dominated by Google, Facebook, and co."

Zurich-based newspaper Neue Zurcher also posted: "The rejection of additional financial aid could also be a reaction to reporting in coronavirus times. The media's credibility has been put to the test in these last two unusual years. Their conspicuous closeness to the state and the - as we now know - loyalty to the government of certain outlets imposed by their management must have shaken the confidence of many citizens in the fourth estate of democracy."

The full results from the Swiss referendum showed 54.6% voting against the financial package for the 'already bought' media corporations.

In a time of media mass control and hypnosis, it is positive to see Switzerland pull the financial reins in on an already compromised industry.

---



# Saudi carries out capital punishment sentences

RIYADH, March 12, 2022: "The Ministry of Interior has announced that it carried out the sentences of capital punishment against individuals convicted of terrorism and capital crimes.

"These 81 individuals were convicted of various crimes including murdering innocent men, women and children.

"Crimes committed by these individuals also include pledging allegiance to foreign terrorist organisations, such as ISIS, Al Qaeda, and the Houthis, targeting residents in the Kingdom and travelling to regional conflict zones to join terrorist organisations.

"They also include convictions for targeting government personnel and vital economic sites, the killing and maiming of law enforcement officers and planting land mines to

by WINSTON SMITH

target police vehicles. Moreover, the convictions include crimes of kidnapping, torture, rape, smuggling arms and bombs into the Kingdom.

"The aforementioned individuals were arrested, tried in Saudi courts, through trials overseen by a total of 13 judges over 3 separate stages of trial for each individual.

"The accused were provided with the right to an attorney and were guaranteed their full rights under Saudi law during the judicial process, which found them guilty of committing multiple heinous crimes that left a large number of civilians and law enforcement officers dead.

"The Kingdom will continue to take a strict and unwavering stance against terrorism and extremist ideologies that threaten the stability of the entire world."

---

# If you want to help counter the corporate propaganda...

Why not pre-order advance copies of *The Light* each month for your group, town or community?

25 copies for £10
50 copies for £15
100 copies for £20
500 copies for £50



thelightpaper.co.uk/bulk-order

**INTERNATIONAL NEWS**

# 'We will all die of a total lie': Bishops condemn artificial pandemic and Vatican stance

THE early months of 2020 were marked by an outbreak of an infection which caused less deaths than ordinary seasonal flu.

An artificial pandemic not only affected healthcare, but also paralysed the economy, education, private life, and undermined morals. The Vatican has taken an active part in this artificial pandemic. Through his unGodly activities, Pope Bergoglio has consciously boycotted the urgent warnings from experts against the mRNA vaccination, and forced the whole Vatican to get vaccinated - all except those guards have succumbed.

The Byzantine Catholic Patriarchate (BCP), on the other hand, has supported the true stance of scientists with integrity, who have stood in defence of truth against the system of lies.

They include top U.S. scientists such as Dr. Judy Mikovits and Dr. David Martin, Czech microbiologist Soňa Peková, and Prof. Alexander Redko from Russia. Let us briefly mention the scientific conference in St. Petersburg held on October 20-21, 2021 and the summit of physicians in Rome on September 12-14, 2021 where over 12,700 doctors and scientists signed the Rome Declaration. They referred to the forced experimental vaccination as a crime against humanity as defined by the Nuremberg Code.

Dr. David Martin: "This is not a vaccine. This is an mRNA packaged in a fat envelope that is delivered to a cell. It is a medical device designed to stimulate the human cell into becoming a pathogen creator. It is not a vaccine... Vaccines actually are a legally defined term. They are a legally defined term under public health law and under CDC and FDA standards.

"You are getting injected with a chemical substance to induce illness, not to induce an immuno-transmissive response. In other words: nothing about this is going to stop you from transmitting anything. This is about getting you sick and having your own cells be the thing that gets you sick."

Dr. Judy Mikovits: "It is a synthetic pathogen. They have literally injected the very pathogenic part of the virus into the body... it can directly cause multiple sclerosis, Lou Gehrig's disease, Alzheimer's disease - because that's what the expression of that pathogenic envelope is; it can cause accelerated cancer... That's what the expression of that piece

## by BYZANTINE CATHOLIC PATRIARCHATE

of virus has been known to do for decades. You are injecting the disease – literally."

Immunology expert, Professor Alexander Redko from St. Petersburg, said: "I spend time in the hospitals where they treat covid patients. I am well informed; I follow the development and I know what is going on there... and it is mostly those that had been vaccinated that got sick. They develop all the obvious coronavirus symptoms. According to the data from pathoanatomists, more than 62% of those who are hospitalised at the inpatient departments for covid patients are fully vaccinated."

QR codes designate those who are good and those who are bad. The healthy ones are the bad ones, the sick and vaccinated ones are the good ones. That is what QR codes indicate; nothing more.

There is no pandemic. To qualify for a pandemic, epidemics must be present in all countries. But there are no epidemics here. To qualify, it is necessary for 5% of the population to be sick at the same time.

The PCR test is made for viruses with a long chain, and this is a virus with a short chain. It means that it is from a completely different area. It is not possible to use it to identify the coronavirus.

We will all die of a total lie. Because no matter where you go, you will find a lie.

To give antivirals, ones that aren't specifically against SARS-CoV-2 - is a crime. And that can be found in the protocols of the Department of Health! What should be done with the Department of Health? You need to answer that yourselves.

Now you make isolated weirdos of us all. You will look us down and transfer the children to remote learning to destroy our immune health.

This is not a pandemic, but an infodemic, and all that is going on in politics and a socio-economic experiment on the population.

Sputnik V – that is not Sputnik 'Vee', but 'Five', because it is only the fifth vaccine which they have worked on in the entire history of their company. And they have not managed to do one successfully.

I think that it is necessary to get vaccinated if a) there is a vaccine, b) if the virus does not mutate, or in other words, if the vaccine can help fight against what is present in

the environment.

The virus that used to be here a while ago is no longer here. The thing they want to develop a vaccine against – and which usually takes six years to make – that virus is no longer here. There are some delta variants, they can call them whatever they want, but that is something already completely different. And you are saying that you are getting vaccinated against something, that was here two years ago? They say that the vaccine does not help any more, because we have a new mutation here. So why do you keep vaccinating? If you really care that much, make a vaccine against the current mutation - but you can't!

That is why what they are offering us is not a vaccine. It is adenovirus 26, adenovirus 5, on which they put spike protein – and why? That is not clear. Because SARS-CoV-2 has never been isolated. A reward of 1.5 million Euros was offered for someone to isolate it. And if no one had ever isolated it, what are you actually vaccinating against? Why are you deceiving people? This is a commercial project.

And I insist that it is not possible to even discuss it, since a) the virus has not been isolated, b) there is no vaccine against it, c) clinical trials will be completed on December 31, 2022. The trials have not been completed, the results of the first phase when all the rats died have not been published. The results of the third phase likewise are not published as the trials have not been completed. Antibodies titer has not been determined, anti-epidemic impact has not been identified, the immune response has not been specified – what kind of results are these? The project must be shut down instead of continuing the mass 'vaccination'.

But people don't know it. They say: "I was vaccinated. I am fine." 25% of people are injected with a placebo, that is what makes them feel good and that is why they get sick again. But those who get really vaccinated get more seriously sick. And they get a full-blown coronavirus with all the post-covid symptoms - lung damage, central nervous system damage, Guillain Barré syndrome and all other issues.

Everything that accompanies covid, the same is present with the vaccine reactions. And I have many acquaintances and acquaintances of my acquaintances, who a) got sick and b) are no longer alive – after the shot.

◼ https://bcp-video.org/bravo-specialists/



# Sweden justified in implementing only minimal lockdown rules

**by PAUL BENNETT**

SWEDEN'S well publicised covid policy of no lockdowns during the past two years has been deemed 'fundamentally correct' according to a government-approved safety commission.

Sweden unfairly received criticism from many Western nations for its stance on covid. The Scandinavian country opted against implementing harsh lockdowns and closing schools. Instead, the Swedish Government and health officials recommended to its citizens a voluntary approach in managing covid, with a strong emphasis on personal responsibility.

A panel of eight experts including professors of economics and political science examined Sweden's unique covid response. The commission stated in its final report: "In comparison with the rest of Europe, Sweden has come through the pandemic relatively well and is among the countries with the lowest excess mortality over the period 2020-2021." The report added, "Focusing on advice and recommendations which people were expected to follow voluntarily

was fundamentally correct. It meant that citizens retained more of their personal freedom than in many other countries."

Despite praising the overall covid response, the panel reported, "In February-March 2020, Sweden should have opted for more rigorous and intrusive disease prevention and control measures."

Health Minister Lena Hallengren responded to the report's findings by saying: "The non-lockdown policy has been much debated. I've had to answer a lot of questions during the pandemic about the "Swedish strategy". The fact that the commission concluded that the overall strategy, based on non-invasive recommendations... was the right choice. I think that's good."

The report highlighted the worldwide issue of handing too many powers and responsibilities to government-approved health agencies. "In a crisis, there must be no uncertainty about who is in charge," the commission reported.



# South African doctor told to stop labelling the omicron variant as mild

**by PAUL BENNETT**

ONE of the first doctors in the world to assess and treat the omicron variant was told to stop playing down the mild features of the variant. Dr Angelique Coetzee, a South African GP who was one of the first doctors to discover the new variant in November 2021.

Dr Coetzee told German newspaper Die Welt, "I was told not to publicly state that it was a mild illness. I have been asked to refrain from making such statements and to say that it is a serious illness. I declined."

She added, "In the Netherlands, in the UK, scientists asked: "How can you explain that it's a mild disease? It's a serious illness. Look at the mutations." My reports have thrown them off track. In a pandemic, you also have to look at what is happening at the grassroots level. The general practitioners who treat the sick every day must be asked what they experience, how the clinical picture presents itself."

In an interview with the Australian Daily Telegraph, Dr Coetzee reported, "Because of all of covid's mutations, all of these scientists and politicians who aren't from South Africa were contacting me telling me I was wrong when I spoke out, that it was a serious disease... they were telling me I had no idea what I was talking about, they kept attacking me. In South Africa, it is a lighter disease, but in Europe it has been a serious, serious illness, which is what the politicians want me to say. There has been a lot of pressure from European scientists and politicians who have said 'Please don't say it is a mild illness'."

Many countries will never admit their part in whipping up mass hysteria, especially regarding the mild omicron variant. One hopes that more doctors like Dr Coetzee will bravely speak out on what they see or don't see in their work health settings.